E-FILED
Tuesday, 16 June, 2026  05:25:59 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| PHARMACEUTICAL CARE MANAGEMENT ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>ANN GILLESPIE,<br>in her official capacity as<br>Director of the Illinois Department of Insurance, and<br>ILLINOIS DEPARTMENT OF INSURANCE<br><br>Defendants. | Civil Action No. _____ |

## <u>COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF</u>

Plaintiff Pharmaceutical Care Management Association ("PCMA"), on behalf of its members, brings this complaint against Ann Gillespie ("Gillespie") in her official capacity as Director of the Illinois Department of Insurance (the "DOI") and the DOI, and alleges as follows:

### <u>INTRODUCTION</u>

1. For more than fifty years, the federal Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, has preempted state laws that "relate to" employee benefit plans covered by ERISA.  29 U.S.C. § 1144(a).

2. This case concerns the Illinois Prescription Drug Affordability Act (the "PDAA"). The PDAA was signed into law on July 1, 2025.  The law imposes sweeping mandates and restrictions on many different types of health plans, including those covered by ERISA.

3. In 2016, the Supreme Court held that state laws requiring ERISA plans or their agents to make detailed disclosures to state agencies "relate to" ERISA plans and are therefore preempted.  *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312 (2016).

1

4.      The PDAA violates ERISA's express preemption provision by requiring parties providing pharmacy benefit management services to health benefit plans to disclose "information relating to health care costs, prices, quality, utilization . . . including data relating to health insurance claims and enrollment"—including in relation to self-insured ERISA plans—***precisely like*** the Vermont statute invalidated by the Supreme Court's decision in *Gobeille*.  577 U.S. at 315-16.

5.      The Supreme Court has also made clear that state laws that "require providers to structure benefit plans in particular ways" are preempted.  *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86-87 (2020).  State laws that dictate the design of health benefit plan provider networks (including pharmacy networks) are therefore preempted and may not be applied to ERISA plans.  *See McKee Foods Corp. v. BFP Inc.,* 173 F.4th 242 (6th Cir. 2026); *Pharm. Care Mgmt. Ass'n v. Mulready*, 78 F.4th 1183 (10th Cir. 2023).

6.      The PDAA includes network design restrictions that prohibit financial incentives for health benefit plan beneficiaries to use certain preferred pharmacies.  These restrictions impair the ability of pharmacy benefit managers ("PBMs") and plans to utilize preferred pharmacy networks to ensure cost-efficient, high-quality pharmaceutical care.  These provisions are preempted by ERISA because they dictate the design and structure of employee benefit plans in violation of ERISA's express preemption clause.

7.      The PDAA purports to apply to "pharmacy benefit managers," but its impact will be felt much more broadly.  First, the law's broad definition of "pharmacy benefit manager" captures *any* party performing claims processing or other services, which includes any third-party administrator and could even capture health benefit plans themselves.  Second, health

2

benefit plan sponsors (Illinois employers and unions) and plan beneficiaries (Illinois workers) will ultimately pay the price of compliance.

8. This lawsuit seeks a declaration that the PDAA's reporting requirements (215 ILCS § 5/513b1.1) and its network design restrictions (215 ILCS § 5/513b1) are expressly preempted by ERISA as applied to ERISA-covered plans sponsored by employers and unions, and requests that the Court enjoin Defendants from enforcing these provisions against PBMs serving those plans.

## JURISDICTION AND VENUE

9. PCMA's cause of action arises under 42 U.S.C. § 1983, the Declaratory Judgment Act (28 U.S.C. §§ 2201-2202), the Supremacy Clause of the U.S. Constitution, and the Court's inherent equitable powers.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to these claims occurred and will occur in this district and because Defendants reside in this district.

## THE PARTIES

11. PCMA is the national trade association representing PBMs. PCMA's PBM member companies administer prescription drug benefits for more than 289 million Americans covered by ERISA and non-ERISA health plans.

12. PCMA is a non-profit 501(c)(6) corporation duly organized under the laws of the State of Delaware with a principal place of business in Washington, D.C. PCMA's institutional mission is to advance the common interests of PBMs; to help PBMs improve the safety and affordability of prescription drug services; and to educate and advocate on behalf of PBMs before state and federal legislators and regulators and in court.

13.     PCMA's members include Abarca Health, CarelonRx, CerpassRx, Express Scripts, Inc., Humana Pharmacy Solutions, LucyRx, MedImpact Healthcare Systems Inc., Navitus, Optum Rx, PerformRx, Prime Therapeutics, ProAct, Rx Benefits, RxPact, RxSense, Script Care Ltd., Serve You Rx, TrueRx, VytlOne, Waltz Health, and WellDyne.

14.     Defendant Ann Gillespie is the Director of the Illinois DOI and is being sued solely in her official capacity.  The DOI Director has "the rights, powers, and duties appertaining to the enforcement and execution of all the insurance laws of this State," 215 ILCS § 5/401, including the PDAA.  The DOI is headquartered at 320 W. Washington Street, Springfield, Illinois 62767.

## STANDING

15.     PCMA brings this lawsuit on behalf of its members.  PCMA's members administer prescription drug benefits on behalf of their health plan customers, which include health plans and beneficiaries who reside in or purchase pharmaceuticals in Illinois.

16.     PCMA's members will be injured if they are required to comply with the PDAA's extensive reporting requirements, with the first annual report due September 1, 2026.  To comply with the reporting requirements, PCMA's members and their customer health plan sponsors (employers and unions) must incur significant administrative costs to prepare the requested annual report.  The report will by necessity include sensitive and confidential information belonging to the PBMs, health benefit plans, and their members.  If they do not comply, PBMs face fines of up to $10,000 per day.

17.     PCMA's members are also injured by the PDAA's network design provisions because those provisions restrict their ability to design and administer pharmacy networks at the direction of their ERISA plan customers, including their ability to offer beneficiaries incentives to use pharmacies that provide cost savings or quality advantages.  PCMA's members rely on

beneficiary incentives to operate preferred pharmacy networks, which would be proscribed by the PDAA's operation.  As a result, health benefit plans serviced by PCMA's members will no longer be able to ensure high-quality, cost-efficient care at select pharmacies, and their beneficiaries will suffer.

18.     The interests PCMA seeks to protect through this Complaint are germane to its institutional mission, as the challenged provisions of the PDAA reduce the value proposition of PBM services and subject PCMA's members and the customer health plans they serve to unnecessary and unconstitutional costs.

19.     The claims in this Complaint serve PCMA's members' common interests.  PCMA accordingly has Article III standing to sue on behalf of the members under the doctrine of associational standing.  Neither the claims asserted, nor the relief requested, require the participation of individual members in this lawsuit.

### ERISA PREEMPTION

20.     ERISA is a comprehensive federal statute that regulates employee benefit plans, including prescription drug benefit plans.  29 U.S.C. § 1001 *et seq*.  ERISA was passed in 1974, and includes a broad preemption provision, providing that ERISA and its implementing regulations "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."  29 U.S.C. § 1144(a).

21.     With this express preemption language, Congress "intended to preempt the field for Federal regulations, thus eliminating the threat of conflicting or inconsistent State and local regulation of employee benefit plans." *Shaw v. Delta Air Lines*, 463 U.S. 85, 99 (1983).

22.     ERISA's preemption clause is rooted in Congress's acknowledgment that "[a] patchwork scheme of regulation would introduce considerable inefficiencies in benefit program operation," leading to "reduce[d] benefits" for American workers.  *Fort Halifax Packing Co. v.*

*Coyne*, 482 U.S. 1, 11 (1987).  Therefore, Congress sought to avoid "[r]equiring ERISA administrators to master the relevant laws of 50 States," which "would undermine the congressional goal of minimiz[ing] the administrative and financial burden[s] on plan administrators – burdens ultimately borne by the beneficiaries."  *Gobeille*, 577 U.S. at 321 (internal quotation marks and citations omitted).

23.    In the more than fifty years since ERISA's passage, Congress has continued to exercise its prerogative to occupy the field of employee benefits by amending ERISA numerous times, including most recently this year in the Consolidated Appropriations Act of 2026.

24.    The Supreme Court has addressed ERISA's "comprehensive" preemption provision many times over the past five decades.  In determining whether a state law "relate[s] to" employee benefit plans under that provision, the Court looks to whether the law has a "reference to" or "connection with" employee benefit plans covered by ERISA.  *Gobeille*, 577 U.S. at 319-20.

25.    Relevant here is the "connection with" test.  State laws have an impermissible "connection with" ERISA plans if they "govern . . . a central matter of plan administration" or "interfere[] with nationally uniform plan administration."  *Id.* at 323.  Preempted state laws include those that prohibit employers from structuring their employee benefit plans in a particular way, *Shaw*, 463 U.S. at 97,  and those that "bind[] ERISA plan administrators to a particular choice." *Egelhoff v. Egelhoff*, 532 U.S. 141, 147 (2001).

26.    In 2016, the Supreme Court considered a challenge brought by Liberty Mutual Insurance Company to invalidate a Vermont law that required various entities, including ERISA health plans and their administrators, to disclose "payments relating to health care claims and other information relating to health care services."  *Gobeille*, 577 U.S. at 315.

6

27.     The Vermont law at issue in *Gobeille* required public and private payors to provide information to be "compiled into a database reflecting 'all health care utilization, costs, and resources in [Vermont], and health care utilization and costs for services provided to Vermont residents in another state.'" *Id.*, citing 18 V. S. A. §9410(b).

28.     Liberty Mutual, a self-funded ERISA plan sponsor, challenged the law's requirement that its third-party administrator, Blue Cross Blue Shield of Massachusetts, report the information it possessed about plan members (Liberty Mutual's employees and former employees and their families).

29.     The Supreme Court confirmed that "Vermont's reporting regime . . . both intrudes upon 'a central matter of plan administration' and 'interferes with nationally uniform plan administration.'" *Id.* at 323.

30.     Because Vermont's law governed "fundamental components of ERISA's regulation of plan administration," opening plans up to "wasteful administrative costs" and "wide-ranging liability," the Court held that "[p]re-emption is necessary." *Id.*

31.     *Gobeille* remains good law today.

32.     In the ten years since *Gobeille*, the Supreme Court has reaffirmed the "connection with" test for ERISA preemption. In 2020, it reinforced that this test captures not only reporting requirements like those at issue in *Gobeille*, but also "laws that require providers to structure benefit plans in particular ways." *Rutledge*, 592 U.S. at 86-87.

33.     Laws that restrict how ERISA plans choose to design their provider networks fall squarely within ERISA's preemptive scope. For this reason, every federal court of appeals that has considered a challenge to a law that dictates the structure of provider networks has found that those laws bear an impermissible connection with ERISA and are therefore preempted. *See, e.g.*,

*Ky. Ass'n of Health Plans v. Nichols*, 227 F.3d 352, 362 (6th Cir. 2000); *CIGNA Healthplan v. Louisiana ex rel. Ieyoub*, 82 F.3d 642, 649 (5th Cir. 1996); *see also Ky. Ass'n of Health Plans v. Miller*, 538 U.S. 329 (2003).

34.     After *Rutledge* reiterated that ERISA preempts laws that dictate benefit design, multiple courts have invalidated state laws that dictate the structure of benefit plans by imposing restrictions or mandates on the structure of a pharmacy network, including laws targeting PBMs. *See McKee Foods Corp.*, 173 F.4th 242; *Mulready*, 78 F.4th 1183; *see also Iowa Ass'n of Bus. & Indus. v. Ommen*, 799 F. Supp. 3d 795 (S.D. Iowa 2025) (preliminarily enjoining law because Plaintiff likely to succeed on merits of ERISA preemption challenge).

### FACTS

A.  The Prescription Drug Market and PBMs' Administrative Role

35.     Most Americans who obtain prescription drugs through employer-sponsored or union-sponsored medical plans are covered by plans subject to ERISA.  Approximately two-thirds of those employer-sponsored plans and multiemployer plans are "self-funded" ERISA plans, meaning that they reimburse covered products and services with their own funds and employee premium contributions, rather than purchasing third-party health insurance for their members.

36.     When a consumer fills a prescription at the pharmacy counter, the resulting transaction is the product of several pre-existing contractual relationships involving several different entities across the supply chain.  Manufacturers make and bring drugs to market. Wholesalers purchase drugs in bulk from the manufacturers and distribute them to pharmacies, doctors, and hospitals.  PBMs negotiate drug reimbursement prices with pharmacies. Prescription drug benefit plans set cost-sharing allocation for their beneficiaries, which determines what percentage of prescription prices is paid by the beneficiary, and what percentage

is paid by the plan.  In this way, consumers can take advantage of prices negotiated between PBMs (on behalf of health benefit plans) and pharmacies.

37.    Designing and administering prescription-drug benefit plans is a complex and time-consuming undertaking that employers and unions ordinarily do not handle on their own. Most employer and union sponsors of self-funded plans therefore retain PBMs to provide recommendations on the design of, and to help administer, their prescription-drug benefit plans.

38.    The sponsor of a prescription-drug benefit plan (typically, an employer or union) determines the plan's benefit design, which includes "what drugs the plan covers (the formulary), how much the plan will pay for those drugs (the cost-sharing terms), and at which pharmacies beneficiaries can have prescriptions filled (the pharmacy network)." *Mulready*, 78 F.4th at 1188.

39.    PBMs perform numerous tasks to help the health benefit plan achieve its benefit design goals.  These tasks include helping plan sponsors construct pharmacy networks (retail, mail-order, and specialty pharmacy networks), including helping them decide how broad or narrow a network to adopt and whether to use a preferred network.

40.    Preferred pharmacy networks are limited networks of pharmacies where plans and beneficiaries pay a lower amount for the drug than at a pharmacy in the standard network.

41.    A preferred pharmacy network provides benefits to pharmacies, plan sponsors, and beneficiaries.  Beneficiaries benefit because plan sponsors offer reduced copayments and co-insurance for drugs obtained at a pharmacy in the preferred pharmacy network.  Pharmacies in the preferred network benefit because they obtain a higher volume of beneficiaries from being in a limited network of pharmacies where beneficiaries can obtain drugs at lower cost-sharing

amounts.  Plan sponsors benefit because pharmacies in a preferred network agree to lower reimbursement rates.

42.  In addition to benefit design tasks, PBMs assist with myriad administrative tasks, including processing claims and appeals and monitoring pharmacy compliance.  Importantly, PBMs assist plans in fulfilling their government and beneficiary reporting obligations.  "ERISA's reporting, disclosure, and recordkeeping requirements for welfare benefit plans are extensive."  *Gobeille*, 577 U.S. at 321 (citing 29 U.S.C. §§ 1021-1024, 1131).  The requirements include disclosures to plan participants concerning plan coverage and the plan financials, and an annual report to the Secretary of Labor.  PBMs managing pharmacy benefits and other third-party administrators serving ERISA plans assist those plans in meeting those requirements.

43.  In almost every case, plans direct the work that PBMs perform.  PBMs use their expertise to make recommendations on plan design.  For plan administration, PBMs follow the direction of plan fiduciaries.

B.  The Illinois Prescription Drug Affordability Act

44.  The PDAA, proposed as HB1697, was signed into law on July 1, 2025.  It includes sweeping restrictions on and mandates for pharmacy benefit managers, defined as "a person, business, or entity, including a wholly or partially owned or controlled subsidiary of a pharmacy benefit manager, that provides claims processing services or other drug or device services, for health benefit plans."

45.  The statute provides that "Notwithstanding [specific exemptions for self-funded employee benefit plans] of the Insurance Code," "health benefit plan" includes self-funded employee welfare benefit plans except for self-funded multiemployer plans that are not nonfederal government plans.

46.     Although certain provisions of the PDAA that impose requirements on an "insurer" or "health insurer" do not apply to self-funded ERISA plans, the provisions of the PDAA applicable to "pharmacy benefit managers" include PBMs  serving employer or union sponsored self-funded ERISA plans (except self-funded multiemployer plans) by virtue of the definition's reference to "health benefit plans."

C.  The PDAA's Reporting Requirements

47.     Section 513b1.1 of the PDAA requires PBMs to submit an annual report to the Department of Insurance and plan sponsors and insurers by September 1, with the first annual report due September 1, 2026.

48.     The annual report requires extensive data reporting.  It requires "data on the health benefit plan" including for each plan "a list of drugs including corresponding information on therapeutic class, brand name, generic name, or specialty drug name," "number of covered individuals," "number of drug-related claims," "dosage units," "dispensing channel used," and "average wholesale acquisition cost per drug."  The PBM is also required to disclose total gross spending on drugs by each plan and total net spending on drugs by each plan customer.

49.     The annual report includes numerous metrics that must be disclosed on a claim-by-claim basis, including:  "total out-of-pocket spending" by individual per drug, per transaction; the amount paid by the plan to the PBM for reimbursement per transaction; the amount paid by PBM to pharmacies per transaction; the specific rebate amount received by the PBM per transaction; the amount passed through to the plan per transaction; and the amount passed through to the covered individual at the point of sale per transaction.

50.     Finally, the annual report requires disclosure of any information collected from manufacturers pertaining to copayments; any compensation paid to brokers, consultants, or advisors for "referrals, consideration, or retention by the health benefit plan"; explanation of

11

benefit design parameters that steer covered individuals toward affiliated pharmacies, the

percentage of drugs charged by affiliated pharmacies, and a list of drugs dispensed by affiliated

pharmacies with their costs; and copies of each contract the PBM has with the plan sponsor or

insurer.

51.    The PBM is also required to prepare a "summary format" of the report with

"aggregated information to help covered individuals understand their health benefit plan's drug

coverage."  This summary version of the report shall be marked for public access.

52.    Failure to submit the report could result in a fine of up to $10,000 per day. 215

ILCS § 5/513b1.1(d).

53.    The law states that the annual reports will be used "for the creation of a

pharmacist dispensing cost report."  215 ILCS § 5/513b1.1(b).  The collection of data for the

purpose of generating a state report renders the PDAA directly analogous to the state all-payer

claims database governed by the Vermont law at issue in *Gobeille*.

54.    Many of the PDAA's disclosure requirements seek information on matters

pertaining to highly confidential plan and sponsor decisions, such as manufacturer rebates, and

highly confidential personal health information relating to plan participants.

55.    ERISA requires government reporting for some of the information demanded by

the PDAA.  For example, most self-funded ERISA plans must file Form 5500 with the Secretary

of Labor, which reports assets and liabilities and receipts and disbursements of funds, including

paid claims.  *See Gobeille*, 577 U.S. at 321; *see also* Dept. of Labor, Reporting and Disclosure

Guide for Employee Benefit Plans, available at

https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-

center/publications/reporting-annual-disclosure.pdf; Schedule H (Form 5500).  ERISA also

requires plans to make significant disclosures to beneficiaries.  29 U.S.C. §§ 1021-1024; 29 U.S.C. § 1133.

56. PBMs assist ERISA plans with their reporting and disclosure obligations.

57. In coming years, PBMs will also be required to report detailed claims and compensation data to the health plans that they serve pursuant to an amendment to ERISA passed earlier this year.  *See* Consolidated Appropriations Act, 2026, 119 P.L. 75; 2026 Enacted H.R. 7148; 119 Enacted H.R. 7148; 140 Stat. 173.

58. Although there is some overlap in the reporting and disclosure requirements of the PDAA and ERISA, the differences between the two "undermine the congressional goal of minimiz[ing] the administrative and financial burden[s] on plan administrators – burdens ultimately borne by the beneficiaries."  *Gobeille*, 577 U.S. at 321 (citations omitted).

D.  The PDAA's Network Design and Anti-Steering Provisions

59. The PDAA prohibits "steering." 215 ILCS § 5/513b1(f-10). "Steer" is defined to include, but is not limited to: (1) requiring a patient to use an affiliated pharmacy; (2) "offering or implementing" a plan design that "encourages" a covered individual to use an affiliated pharmacy "if the plan design increases costs" for the patient, such as imposing higher co-pays or cost-sharing for use of non-affiliated pharmacies; and (3) reimbursing a pharmacy less than the amount that a PBM would reimburse itself or an affiliate. 215 ILCS § 5/513b1(a).

60. The prohibition on steering directly infringes on plan design.  Plans cannot offer a preferred pharmacy network without providing beneficiaries discounts and other forms of incentives to drive their prescriptions to preferred pharmacies.

61. The PDAA's network design and anti-steering provisions mirror the provisions struck down in *Mulready*, 78 F.4th at 1191, and *McKee Foods Corp.*, 173 F.4th at 269, and are

similar to those preliminarily enjoined by and held likely to be preempted in *Ommen*, 799 F.

Supp. 3d at 824-29.

E.   The PDAA's Provisions Inflict Immediate and Concrete Harms

62.    Absent declaratory and injunctive relief, the PDAA's reporting requirements and network design restrictions will cause imminent harm to PCMA's members.  PCMA's members will be required to compile and submit extensive, claim-level data to Illinois state authorities by September 1, 2026, or face fines of up to $10,000 per day.

63.    The PDAA's network design and anti-steering restrictions require PCMA's members to restructure pharmacy benefit designs for ERISA plans operating in Illinois, eliminating cost-saving features and network differentiation that plan participants and sponsors would otherwise enjoy.

64.    Going forward, PBMs will have to develop burdensome administrative processes and state-specific plan designs applicable to ERISA plans in Illinois but not to ERISA plans in other states.  The inefficiencies inherent in these kinds of state-by-state compliance efforts are precisely those that ERISA's express preemption clause was designed to prevent.  *See* 29 U.S.C. § 1144(a); *see also Gobeille*, 577 U.S. at 323 ("Pre-emption is necessary" where state law exposes plans to "wasteful administrative costs" and "wide-ranging liability").

65.    The public interest and balance of equities favor a declaration and permanent injunctive relief in favor of PCMA.  Although the initial burden of complying with the PDAA falls on PBMs, some costs of compliance will inevitably be passed on to employer and union plan sponsors, and the workers and their families who are enrolled in health benefit plans.  Plans will also have to change the structure of their pharmacy network to satisfy the PDAA, thereby directly affecting beneficiaries.  ERISA's preemption clause embodies Congress's judgment that

uniform federal standards best serve beneficiaries and plan sponsors by minimizing administrative burden and ensuring consistent rights and obligations.

## CLAIMS FOR RELIEF

## COUNT 1

### (ERISA PREEMPTION OF REPORTING PROVISION)

66.    PCMA realleges paragraphs 1–65 as if fully set forth herein.

67.    "ERISA's reporting, disclosure, and recordkeeping requirements for welfare benefit plans are extensive." *Gobeille,* 577 U.S. at 321.  A state law that compels the disclosure of detailed information by third-party administrators to state authorities is preempted because it intrudes upon a central matter of plan administration.  *Id.* at 323.

68.    The PDAA's reporting requirements under 215 ILCS § 5/513b1.1 compel PBMs acting as third-party administrators of ERISA plans to disclose detailed, claim-level plan information to Illinois state authorities.  The reporting requirements closely mirror the data required under the Vermont law held preempted in *Gobeille*.

69.    The stated purpose of the PDAA's data collection is "for the creation of a pharmacist dispensing cost report," meaning that the purpose of the data collection is not merely "incidental" to the enforcement of other laws. *See Gobeille*, 577 U.S. at 325-26.  This data collection purpose is directly analogous to the state all-payer claims database governed by the Vermont law at issue in *Gobeille*, which was purportedly designed for the purpose of collecting information on health care utilization, pricing, and quality.

70.    The PDAA's reporting requirements have an impermissible "connection with" ERISA plans because they deal with the subject matters covered by ERISA—namely, reporting,

15

disclosure, and recordkeeping—which are central to, and an essential part of, the uniform system of plan administration contemplated by ERISA. *Gobeille*, 577 U.S. at 323; 29 U.S.C. § 1021.

71.    The PDAA's reporting requirements impose novel, inconsistent, and burdensome requirements that interfere with nationally uniform plan administration, in violation of ERISA's express preemption clause. 29 U.S.C. § 1144(a).

## COUNT 2

### (ERISA PREEMPTION OF PDAA NETWORK DESIGN PROVISION)

72.    PCMA realleges paragraphs 1–71 as if fully set forth herein.

73.    The Supreme Court has long held that ERISA preempts state laws that interfere with employee benefit plan design. *See Shaw*, 463 U.S. at 97 (regulations that "prohibit[] employers from structuring their employee benefit plans in a [particular] manner" are preempted). State law provisions concerning pharmacy network design, including those provisions that prohibit or restrict steering or preferred networks, are preempted because they dictate plan benefits by dictating the scope and nature of the pharmacy network. *See, e.g.*, *McKee Foods Corp.*, 173 F.4th at 269 ("[T]he incentive provisions bar ERISA plans operating in Tennessee from steering plan participants toward or away from certain pharmacies with higher or lower cost-sharing arrangements. This restriction operates to require an ERISA plan to 'structure [its] benefit plans in [a] particular way[].'") (citing *Rutledge*, 592 U.S. at 86-87); *Mulready*, 78 F.4th at 1198 ("ERISA preempts these provisions because a pharmacy network's scope (which pharmacies are included) and differentiation (under what cost-sharing arrangements those pharmacies participate in the network), are key benefit designs for an ERISA plan.").

74.     The PDAA's anti-steering provision in 215 ILCS § 5/513b1 mirrors the provisions struck down in *Mulready* and *McKee Foods*.  It directly infringes on plan design as it would prohibit plans from offering beneficiaries discounts and other forms of incentives that encourage selection of pharmacies that offer significant cost savings or quality advantages.  *See Mulready*, 78 F.4th at 1191; *McKee Foods Corp.*, 173 F.4th at 269.

75.     The PDAA's network design and anti-steering provision has an impermissible "connection with" ERISA plans because it binds ERISA plan administrators to a particular choice concerning benefit plan design—namely, it prohibits plan sponsors from structuring pharmacy networks with preferred network features and cost-sharing differentiation.

76.     The PDAA's network design and anti-steering provision is preempted by ERISA's express preemption clause. 29 U.S.C. § 1144(a).

### REQUEST FOR RELIEF

WHEREFORE, PCMA respectfully prays that this Court enter judgment in its favor and:

a) Declare that 215 ILCS § 5/513b1.1 (the PDAA's reporting requirement) is preempted by ERISA, 29 U.S.C. § 1144(a), and therefore is invalid and unenforceable as applied to ERISA-covered benefit plans;

b) Declare that 215 ILCS § 5/513b1 (the PDAA's anti-steering and network design provision) is preempted by ERISA, 29 U.S.C. § 1144(a), and therefore is invalid and unenforceable as applied to ERISA-covered benefit plans;

c) Permanently enjoin Defendants and their agents from implementing or enforcing 215 ILCS § 5/513b1.1 and 215 ILCS § 5/513b1 in any manner as applied to ERISA-covered benefit plans;

17

d) Award PCMA its reasonable attorneys' fees and costs; and

e) Grant such other and further relief as the Court deems just and proper.

Dated:   June 16, 2026

PHARMACEUTICAL CARE
MANAGEMENT ASSOCIATION

By its attorneys,


*/s/ Kristyn DeFilipp*

Kristyn DeFilipp (*admission pending*) (lead counsel
pursuant to Local Rule 11.2)
Andrew M. London (*admission pending*)
Marilyn Icsman (*admission pending*)
Foley Hoag LLP
155 Seaport Blvd.
Boston, MA 02210
Phone: (617) 832-1000
Fax: (617) 832-7000
kbuncedefilipp@foleyhoag.com
alondon@foleyhoag.com
micsman@foleyhoag.com

*/s/ Andrew M. Ramage*
Andrew M. Ramage (ARDC # 6256554)
Brown Hay + Stephens
205 S. Fifth Street, Suite 1000
Springfield, IL 62701
Phone: (217) 544-8491
Fax: (217) 544-9609
aramage@bhslaw.com