E-FILED
Wednesday, 01 July, 2026 05:15:50 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**

PHARMACEUTICAL CARE MANAGEMENT ASSOCIATION,

Plaintiff,

v.

ANN GILLESPIE,
in her official capacity as
Director of the Illinois Department of Insurance, and
ILLINOIS DEPARTMENT OF INSURANCE

Defendants.

Civil Action No. 26-cv-03200

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


INTRODUCTION ....................................................................................................1

STATEMENT OF FACTS ..........................................................................................1

I. PCMA and the Role of PBMs ..............................................................................1

 A. Background on the Prescription Drug Market ......................................................2

 B. PBMs' Services to Health Plans ...........................................................................3

II. Illinois' Prescription Drug Affordability Act ..........................................................4

 A. Application to PBMs.............................................................................................4

 B. The PDAA's Reporting Requirements ..................................................................4

ARGUMENT ...........................................................................................................6

I. Legal Standard.......................................................................................................6

II. PCMA is Likely to Succeed on the Merits ............................................................7

 A. ERISA Broadly Preempts Any State Law That "Relates To" an Employee Benefit Plan ..................7

 B. The PDAA's Reporting Requirements are Preempted Under Gobeille v. Liberty Mutual Insurance Company ..................9

 1. *Gobeille* Broadly Preempts State Reporting Laws as Applied to ERISA plans and their TPAs ..................9

 2. The PDAA's Reporting Requirements Are Preempted..........................................12

 a. The PDAA Regulates the Same "Central Matter of Plan Administration" as the Vermont Regime that *Gobeille* Held Preempted ..................13

 b. The PDAA Interferes with ERISA's Nationally Uniform Scheme of Plan Reporting and Disclosure..................14

 c. The PDAA is Not Merely Incidental to Enforcement of a Valid Law .............14

III. PCMA's Members Will Suffer Irreparable Harm Absent an Injunction ..............15

 A. Substantial, Non-Recoverable Compliance Costs ..............................................15

 B. Compelled Disclosure of Confidential Business Information ..............................18

 C. Damage to Customer Relationships and Goodwill..............................................20

IV. The Balance of Equities and Public Interest Weigh in Favor of an Injunction......................21

CONCLUSION......................................................................................................23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Mead Johnson & Co.*,
971 F.2d 6 (7th Cir. 1992) ....................7, 20

*Cassell v. Snyders*,
990 F.3d 539 (7th Cir. 2021)....................7

*Champion International Corp. v. Brown*,
731 F.2d 1406 (9th Cir. 1984) ....................22

*Courthouse News Serv. v. Brown*,
908 F.3d 1063 (7th Cir. 2018)....................6

*Doe v. Aetna Inc.*,
2017 U.S. Dist. LEXIS 4866 (N.D. Ill. Jan. 12, 2017) ....................12

*Egelhoff v. Egelhoff*,
532 U.S. 141 (2001)....................9, 11

*Fort Halifax Packing Co. v. Coyne*,
482 U.S. 1 (1987)....................8

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S. of Am., Inc.*,
549 F.3d 1079 (7th Cir. 2008) ....................7, 21

*Gobeille v. Liberty Mut. Ins. Co.*,
577 U.S. 312 (2016).................... *passim*

*Herrera v. Raoul*,
670 F. Supp. 3d 665 (N.D. Ill. 2023) ....................7

*Hess Newmark Owens Wolf, Inc. v. Owens*,
415 F.3d 630 (7th Cir. 2005) ....................19

*Ill. Bankers Ass’n v. Raoul*,
760 F. Supp. 3d 636 (N.D. Ill. 2024) ....................16, 17

*Ill. Republican Party v. Pritzker*,
973 F.3d 760 (7th Cir. 2020) ....................7

*Iowa Ass'n of Bus. & Indus. v. Ommen*,
799 F. Supp. 3d 795 (S.D. Iowa 2025) ....................22

*Life Spine, Inc. v. Aegis Spine, Inc.*,
8 F.4th 531 (7th Cir. 2021) ....................15, 18, 19, 20

*Metro. Life Ins. Co. v. Mass.*,
471 U.S. 724 (1985)....................8

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992)....................16, 17

*Nken v. Holder*,
556 U.S. 418 (2009)....................7

*Nowlin v. Pritzker*,
2021 U.S. Dist. LEXIS 29403 (C.D. Ill. Feb. 17, 2021)....................16

*Ohio v. EPA*,
603 U.S. 279 (2024)....................16, 18

*PepsiCo, Inc. v. Redmond*,
54 F.3d 1262 (7th Cir. 1995) ....................18

*Pharm. Care Mgmt. Ass'n v. District of Columbia*,
613 F.3d 179 (D.C. Cir. 2010)....................2, 3

*Pharm. Care Mgmt. Ass'n v. Mulready*,
78 F.4th 1183 (10th Cir. 2023) ....................2, 3, 9

*Reinders Bros., Inc. v. Rain Bird E. Sales Corp.*,
627 F.2d 44 (7th Cir. 1980) ....................20, 21

*Roland Mach. Co. v. Dresser Indus., Inc.*,
749 F.2d 380 (7th Cir. 1984) ....................7

*Scudder v. Colgate Palmolive Co.*,
2018 U.S. Dist. LEXIS 149592 (D.N.J. Aug. 31, 2018)....................12

*Shaw v. Delta Air Lines, Inc.*,
463 U.S. 85 (1983)....................8

*SKF USA, Inc. v. Bjerkness*,
636 F. Supp. 2d 696 (N.D. Ill. 2009)....................20, 21

*Staffing Servs. Ass'n of Ill. v. Flanagan*,
720 F. Supp. 3d 627 (N.D. Ill. 2024)....................16, 17, 18

*Techtronic Indus. Co. v. Chervon Holdings Ltd.*,
395 F. Supp. 2d 720 (N.D. Ill. 2005)....................20

*Vendavo, Inc. v. Long*,
397 F. Supp. 3d 1115 (N.D. Ill. 2019) ....18, 19

**Statutes**

18 V.S.A. § 9410(c)(3) ....9

215 ILCS § 5/513b1(a) ....4

215 ILCS § 5/513b1.1....1, 14, 23

215 ILCS § 5/513b1.1(a) ....4, 5, 12, 19

215 ILCS § 5/513b1.1(a-d)....12

215 ILCS § 5/513b1.1(b) ....4, 6, 15, 19, 20

215 ILCS § 5/513b1.1(d) ....4, 12, 18

215 ILCS § 5/513b1.1(f-10) ....4

29 U.S.C. § 1001 et seq....7

29 U.S.C. §§ 1021-1024, 1133 ....13

29 U.S.C. § 1144(a) ....1, 7

140 Stat. 173 ....13

Consolidated Appropriations Act, 2026, 119 P.L. 75....13, 22

Employee Retirement Income Security Act of 1974 .... *passim*

Illinois' Prescription Drug Affordability Act .... *passim*

**Other Authorities**

119 Enacted H.R. 7148 ....13

2026 Enacted H.R. 7148 ....13

Dept. of Labor, Reporting and Disclosure Guide for Employee Benefit Plans,
available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/reporting-annual-disclosure.pdf ....13

KFF, *2024 Employer Health Benefits Survey*, Oct. 9, 2024,
https://www.kff.org/health-costs/2024-employer-health-benefits-survey/#c09d7226-4c0f-4859-8041-c17521a00458 ....2

## INTRODUCTION

For more than fifty years, the Employee Retirement Income Security Act of 1974 ("ERISA") has expressly preempted "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). Illinois' Prescription Drug Affordability Act (the "PDAA") unequivocally relates to employee benefit plans and is therefore preempted. The PDAA imposes sweeping mandates and restrictions on health plans—including ERISA-covered plans.

PCMA hereby moves to enjoin the PDAA's extensive reporting scheme that compels pharmacy benefit managers ("PBMs") serving as third-party administrators to ERISA plans to disclose detailed, claim-level plan data to state authorities. 215 ILCS § 5/513b1.1 (the "Reporting Requirements"). The PDAA's Reporting Requirements are near equivalent of the state reporting law that the Supreme Court invalidated under ERISA's broad preemption clause in *Gobeille v. Liberty Mutual Insurance Co.*, 577 U.S. 312 (2016). The Reporting Requirements are therefore preempted. For that reason, and because its enforcement will irreparably harm Plaintiff's members, the Court should preliminarily enjoin Defendants and their agents from enforcing the PDAA's Reporting Requirements, 215 ILCS § 5/513b1.1, against PCMA's members as applied to ERISA-covered plans, pending resolution of this litigation on the merits.

## STATEMENT OF FACTS

### I. PCMA and the Role of PBMs

Plaintiff Pharmaceutical Care Management Association ("PCMA") is the national trade association representing PBMs.[1] PCMA's members manage prescription drug benefits for their customers: health plans including ERISA-covered employee benefit plans, Medicare Part D

[1] Pharmaceutical Care Management Association, About PCMA, https://www.pcmanet.org/about/.

plans, and commercial health insurance plans across the country.[2] Roughly two-thirds of employer- and union-sponsored plans are "self-funded" ERISA plans that pay claims with their own funds.[3] Those health plans typically include a prescription drug benefit plan—PBMs specialize in working with health plans to design and administer those prescription drug benefits. *See Pharm. Care Mgmt. Ass'n v. Mulready*, 78 F.4th 1183, 1188 (10th Cir. 2023).

### A. Background on the Prescription Drug Market

The prescription drug supply chain is a web of interdependent contractual relationships, and PBMs play an integral role in that process. When a health plan beneficiary—in the case of an ERISA plan, a worker or their family member—fills a prescription, the transaction results from pre-existing contracts among at least five key players: pharmacies (and pharmacy services administrative organizations, "PSAOs," working on their behalf), wholesalers, manufacturers, PBMs, and health plans. *Mulready*, 78 F.4th at 1188. Pharmacies purchase drugs from wholesalers, who, in turn, purchase drugs from manufacturers. *Id.* PBMs negotiate drug reimbursement prices with pharmacies. *Id.* at 1188-89. Pharmacies then dispense those drugs to beneficiaries of health plans serviced by PBMs. *Id.* Prescription drug benefit plans set cost-sharing for their beneficiaries, which determines what percentage of prescription prices is paid by the beneficiary, and what percentage is paid by the plan. *Id.* In this way, consumers can take advantage of prices negotiated between PBMs (on behalf of health benefit plans) and pharmacies. *Id.* at 1189. *See also Pharm. Care Mgmt. Ass'n v. District of Columbia,* 613 F.3d 179, 183 (D.C. Cir. 2010). The prescription drug market is highly competitive, and the ability to effectively negotiate drug prices is at the core of PBMs' business services. *See* Decl. of David J.

---

[2] *Id.*

[3] KFF, *2024 Employer Health Benefits Survey*, Oct. 9, 2024, https://www.kff.org/health-costs/2024-employer-health-benefits-survey/#c09d7226-4c0f-4859-8041-c17521a00458.

Schryver ("Schryver Decl."), ¶¶ 23-24; Decl. of Michael D. Chestnut ("Chestnut Decl."), ¶¶ 23-24; Decl. of Logan Patrick Harrison ("Harrison Decl."), ¶¶ 23-24.

PBMs typically operate nationally, for several reasons. First, PBMs' clients often include multi-state employers, who themselves are likely to have an interest in uniformity across states for drug benefit plan participants. *See Mulready*, 78 F.4th at 1189. In addition, by operating on a larger scale, PBMs can more effectively negotiate drug prices and maximize cost savings for health plans and their participants. *See id.* at 1189, 1195; *Pharm. Care Mgmt. Ass'n v. District of Columbia*, 613 F.3d at 188.

**B. PBMs' Services to Health Plans**

Because of the complex and time-consuming nature of designing and administering prescription-drug benefit plans, most plan sponsors rely on PBMs to provide recommendations on the design of, and to help administer, those plans. *Mulready*, 78 F.4th at 1188. In addition to working with plans on benefit design, PBMs also perform myriad administrative tasks, including processing claims and appeals and monitoring pharmacy compliance. *See id.* at 1188-89. *See also* Schryver Decl., ¶¶ 3-4; Chestnut Decl., ¶¶ 3-4; Harrison Decl., ¶¶ 3-4. In carrying out these functions, PBMs follow the direction of plan fiduciaries. *See* Schryver Decl., ¶ 4; Chestnut Decl., ¶ 4; Harrison Decl., ¶ 4.

As third-party administrators, PBMs are necessarily responsible for collecting and processing a wide range of confidential information about plan participants and health care providers. *See* Schryver Decl., ¶ 4; Chestnut Decl., ¶ 4; Harrison Decl., ¶ 4. PBMs assist plans in fulfilling their government and beneficiary reporting obligations (and are at times also subject to such obligations themselves). *See Pharm. Care Mgmt. Ass'n v. District of Columbia*, 613 F.3d at 185. *See also* Schryver Decl., ¶ 5; Chestnut Decl., ¶ 5; Harrison Decl., ¶ 5. Those

include federal reporting obligations under ERISA such as disclosures to plan participants concerning plan coverage and the plan financials, and an annual report to the Secretary of Labor. *See, e.g.*, *Gobeille*, 577 U.S. at 321.

## II. Illinois' Prescription Drug Affordability Act

### A. Application to PBMs

The PDAA was signed into law on July 1, 2025, and includes sweeping restrictions on and mandates for PBMs.[4] The law defines "pharmacy benefit manager" as "a person, business, or entity, including a wholly or partially owned or controlled subsidiary of a pharmacy benefit manager, that provides claims processing services or other drug or device services, for health benefit plans." 215 ILCS § 5/513b1(a). Under the PDAA, the term "health benefit plan" includes self-funded employee welfare benefit plans, except for self-funded multiemployer plans that are not nonfederal government plans. *Id.*

### B. The PDAA's Reporting Requirements

Section 513b1.1 of the PDAA requires PBMs to submit an annual report to the Department of Insurance and plan sponsors and insurers by September 1, with the first annual report due September 1, 2026. 215 ILCS § 5/513b1.1(a). Failure to submit the report subjects the PBM to fines of up to $10,000 per day. 215 ILCS § 5/513b1.1(d). The law states that the annual reports may be distributed to an "established institution of higher education in [Illinois]" to be used "for the creation of a pharmacist dispensing cost report" that will be shared with the General Assembly annually. 215 ILCS § 5/513b1.1(b).

The annual report requires extensive information. PBMs must report "data on the health benefit plan," including for each plan "a list of drugs including corresponding information on

---

[4] Count II of the Complaint seeks to invalidate PDAA's pharmacy network design restrictions, 215 ILCS § 5/513b1(f-10), as preempted by ERISA, but this Motion does not seek to preliminarily enjoin that provision.

therapeutic class, brand name, generic name, or specialty drug name," "number of covered individuals," "number of drug-related claims," "dosage units," "dispensing channel used," and "average wholesale acquisition cost per drug." 215 ILCS § 5/513b1.1(a). PBMs must also disclose total gross spending on drugs by each plan and total net spending on drugs by each plan customer. *Id.*

The annual report includes numerous metrics that must be disclosed on a claim-by-claim basis, including: "total out-of-pocket spending" by individual per drug, per transaction; the amount paid by the plan to the PBM for reimbursement per transaction; the amount paid by the PBM to pharmacies per transaction; the specific rebate amount received by the PBM per transaction; the amount of the rebates passed through to the plan per transaction; and the amount of the rebates passed through to the covered individual at the point of sale per transaction. *Id.*

Finally, the annual report requires disclosure of any information collected from manufacturers pertaining to copayments; any compensation paid to brokers, consultants, or advisors for "referrals, consideration, or retention by the health benefit plan"; explanation of benefit design parameters that steer covered individuals toward affiliated pharmacies, the percentage of drugs charged by affiliated pharmacies, and a list of drugs dispensed by affiliated pharmacies with their costs; and copies of each contract the PBM has with the plan sponsor or insurer. *Id.*

In addition, the PBM must prepare a "summary format" of the report containing "aggregated information to help covered individuals understand their health benefit plan's drug coverage." This summary version of the report shall be marked for public access. 215 ILCS § 5/513b1.1(b).

Collectively, the Reporting Requirements span almost every aspect of a PBM's business and operations and often require that data at a granular level. Much of this data pertains to highly confidential plan and sponsor decisions, including proprietary pricing information, such as manufacturer rebate amounts, and personal health information relating to plan participants. Moreover, because PBMs typically operate nationally with uniform data management processes, the Reporting Requirements here would force PBMs to develop Illinois-specific systems for the collection and submission of this data.

## ARGUMENT

The relevant legal factors strongly favor a preliminary injunction in this case. PCMA is likely to succeed on the merits because Supreme Court precedent establishes that the Reporting Requirements are preempted by ERISA. PCMA's members will suffer irreparable harm absent an injunction, and monetary damages are unavailable due to sovereign immunity. Finally, the balance of equities and public interest favor injunctive relief because the harm from enforcement far outweighs any minimal harm that a temporary injunction would cause.

### I. Legal Standard

A movant seeking a preliminary injunction must make a threshold showing that: "(1) without such relief, it will suffer irreparable harm before final resolution of its claims; (2) traditional legal remedies would be inadequate; and (3) it has some likelihood of success on the merits." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). Next, the court weighs "the harm the plaintiff will suffer without an injunction against the harm the defendant will suffer with one." *Id.* This harm analysis employs a "sliding scale approach" wherein "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor[.]" *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S. of Am., Inc.*, 549 F.3d

1079, 1086 (7th Cir. 2008) (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984)) (cleaned up). Finally, courts consider the effect of the injunction on the public interest, or "the consequences of granting or denying the injunction to non-parties." *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021) (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992)). Where the government opposes injunctive relief, the balance of the equities and public interest inquiries are considered together. *See Herrera v. Raoul*, 670 F. Supp. 3d 665, 683 (N.D. Ill. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## II. PCMA is Likely to Succeed on the Merits

In order to show likelihood of success on the merits, "the applicant need not show that it definitely will win the case." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). "A 'strong' showing" of likelihood of success "does not mean proof by a preponderance . . . [b]ut [] normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.* (citations and quotations omitted). Here, PCMA more than satisfies that standard. Under ERISA's broad preemption framework and the Supreme Court's decision in *Gobeille*, the PDAA's Reporting Requirements are definitively preempted.

### A. ERISA Broadly Preempts Any State Law That "Relates To" an Employee Benefit Plan

ERISA is a comprehensive federal statute that regulates employee benefit plans, including prescription drug benefit plans. 29 U.S.C. § 1001 et seq. ERISA includes a broad express preemption provision, preempting "any and all State laws insofar as they may now or hereafter relate to any employee benefit plans." 29 U.S.C. § 1144(a). With this express preemption language, Congress "intended to preempt the field for Federal regulations, thus eliminating the threat of conflicting or inconsistent State and local regulation of employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 99 (1983) (citations and quotations

omitted). Congress enacted ERISA's preemption clause because "[a] patchwork scheme of regulation would introduce considerable inefficiencies in benefit program operation," leading to "reduce[d] benefits" for American workers. *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11 (1987). Therefore, Congress sought to avoid "[r]equiring ERISA administrators to master the relevant laws of 50 States," which "would undermine the congressional goal of minimiz[ing] the administrative and financial burden[s] on plan administrators – burdens ultimately borne by the beneficiaries." *Gobeille*, 577 U.S. at 321 (citations omitted).

A state law "relates to" an employee benefit plan and is therefore preempted "if it has a connection with . . . such a plan." *Shaw*, 463 U.S. at 96-97. A law has a "connection with" a plan if it interferes with nationally uniform plan administration or governs a central matter of plan administration, such as "matters [that] are fundamental components of ERISA's regulation of plan administration." *Gobeille*, 577 U.S. at 320, 323.

ERISA preemption is broad and does not require any conflict between the state law at issue and ERISA's substantive terms. *See Metro. Life Ins. Co. v. Mass.*, 471 U.S. 724, 737 (1985) ("ERISA's broad pre-emption provision was intended to pre-empt any state law that '[related] to' an employee-benefit plan, not merely those state laws that directly conflicted with a substantive provision in the federal statute."); *Gobeille*, 577 U.S. at 324 (a plan "need not wait to bring a pre-emption claim until confronted with numerous inconsistent obligations and encumbered with any ensuing costs."). ERISA preempts laws as applied to plans' third-party administrators because a state law regulating a third-party administrator ("TPA") such as a PBM acting on behalf of an ERISA plan "function[s] as a regulation of [the] plan itself." *Mulready*, 78 F.4th at 1208 (citations and quotations omitted).

### B. The PDAA's Reporting Requirements are Preempted Under *Gobeille v. Liberty Mutual Insurance Company*

#### 1. *Gobeille Broadly Preempts State Reporting Laws as Applied to ERISA plans and their TPAs*

The Supreme Court's decision in *Gobeille* directly applies to and dictates the outcome of this case. *Gobeille*, 577 U.S. 312. In *Gobeille*, the Supreme Court invalidated a Vermont law and implementing regulation that required reporting of detailed information on health care claims and plan members to a state-maintained claims database, because Vermont's reporting regime "both intrudes upon 'a central matter of plan administration' and 'interferes with nationally uniform plan administration.'" *Id.* at 323 (quoting *Egelhoff v. Egelhoff*, 532 U.S. 141, 148 (2001)). The PDAA does the same.

The Vermont reporting regime at issue in *Gobeille* required health insurers, health care providers, health care facilities, and governmental agencies to report any "information relating to health care costs, prices, quality, utilization, or resources required" by the state agency. *Gobeille*, 577 U.S. at 315-16 (quoting 18 V.S.A. § 9410(c)(3)). The Vermont regulations required de-aggregated reporting of "medical claims data, pharmacy claims data, member eligibility data, provider data, and other information related to health care provided to Vermont residents." *Id.* at 316 (citation and quotations omitted). This obligation was imposed on certain self-insured benefit plans governed by ERISA, as well as TPAs acting on behalf of those plans. *Id.* Failure to comply carried fines of up to $2,000 per day and suspension of operating authority. *Id.* at 318.

Plaintiff Liberty Mutual maintained a self-funded ERISA plan that covered 137 individuals residing in Vermont. *Id.* at 317. Because Liberty Mutual itself did not meet the statute's 200-person threshold, it was not directly subject to Vermont's reporting requirements. *Id.* However, its TPA, Blue Cross Blue Shield of Massachusetts, was a mandated reporter, and

the state required it to report information about Liberty Mutual's plan members in Vermont. *Id.* The state issued a subpoena to Blue Cross Blue Shield ordering it to transmit eligibility, medical-claims, and pharmacy-claims files for the plan's Vermont members, against Liberty Mutual's wishes. *Id.* at 318. Liberty Mutual brought an ERISA preemption challenge to the reporting regime. *Id.*

The Supreme Court held that ERISA's "comprehensive" preemption clause invalidated Vermont's reporting regime as applied to ERISA plans because the regime bore an impermissible "connection with" those plans. *Id.* at 319-320. The Court's reasoning rested on two factors, both of which apply with equal force and are dispositive here:

*First*, the Court emphasized that "ERISA's reporting, disclosure, and recordkeeping requirements for welfare benefit plans are extensive" and "are central to, and an essential part of, the uniform system of plan administration contemplated by ERISA." *Id.* at 321, 323. ERISA mandates annual reports to the Secretary of Labor identifying assets, liabilities, receipts, and disbursements—disbursements that "by definition incorporate[] paid claims." *Id.* at 321. The Court emphasized that Congress made reporting and disclosure "a principal and essential feature of ERISA" and committed the design of additional reporting obligations to the Secretary of Labor, "not for the separate States." *Id.* at 324-25.

*Second*, the Court concluded that Vermont's regime "intrudes upon 'a central matter of plan administration' and 'interferes with nationally uniform plan administration,'' because it "compels plans to report detailed information about claims and plan members"—matters that are "fundamental components of ERISA's regulation of plan administration." *Id.* at 323 (quoting *Egelhoff*, 532 U.S. at 148). The Court noted that "[d]iffering, or even parallel, regulations from multiple jurisdictions could create wasteful administrative costs and threaten to subject plans to

wide-ranging liability" and that "[p]re-emption is necessary to prevent the States from imposing novel, inconsistent, and burdensome reporting requirements on plans." *Id.*

The Court rejected the state's argument that a difference in legislative purpose—Vermont's interest in public health data versus ERISA's focus on plan solvency—could save the state regime, explaining that any divergence in purpose "does not transform this direct regulation of 'a central matter of plan administration' into an innocuous and peripheral set of additional rules." *Id.* at 325 (quoting *Egelhoff*, 532 U.S. at 148). The Court also rejected the argument that the reporting regime could be saved by invoking "the State's traditional power to regulate in the area of public health," noting that it "cannot validate a state law that enters a fundamental area of ERISA regulation and thereby counters the federal purpose in the way [Vermont's reporting regime] does." *Id.* at 325-26. The Court noted that the analysis "may be different when applied to a state law . . . the enforcement of which necessitates incidental reporting by ERISA plans," but did not take on that analysis because the purpose of the Vermont law was to collect data for a state database—not to enforce another substantive law. *Id.*

As the Court summarized: "ERISA's express pre-emption clause requires invalidation of the Vermont reporting statute as applied to ERISA plans. The state statute imposes duties that are inconsistent with the central design of ERISA, which is to provide a single uniform national scheme for the administration of ERISA plans without interference from laws of the several States even when those laws, to a large extent, impose parallel requirements." *Id.* at 326-27.

In the ten years since *Gobeille* was decided, courts around the country have continued to apply its principles to preempt state laws that intrude upon central matters of plan administration, including those related to state laws concerning benefit plan disclosures. *See, e.g.*, *Doe v. Aetna Inc.*, 2017 U.S. Dist. LEXIS 4866, at *6 (N.D. Ill. Jan. 12, 2017) (state law claims relating to

disclosure and recordkeeping of medical records are preempted); *Scudder v. Colgate Palmolive Co.*, 2018 U.S. Dist. LEXIS 149592, at *12-13 (D.N.J. Aug. 31, 2018) (state audit of employee benefit plan preempted by ERISA).

2. *The PDAA's Reporting Requirements Are Preempted*

*Gobeille* makes clear that states are not permitted to impose *any* reporting requirements on plans and third parties possessing plan information, unless such requirements are directly incidental to the enforcement of a valid, non-preempted law. *See Gobeille*, 577 U.S. at 326-27 (state statute preempted any time it "imposes duties that are inconsistent with the central design of ERISA, which is to provide a single uniform national scheme for the administration of ERISA plans without interference from laws of the several States even when those laws, to a large extent, impose parallel requirements.").

Even under the narrowest reading of *Gobeille*, however, the PDAA's Reporting Requirements are preempted due to their striking similarities to the Vermont regime invalidated in *Gobeille*. Like the Vermont law in *Gobeille*, the PDAA compels disclosures by third-party administrators, reaches ERISA plans through the administrator's reporting obligation, and is enforced through substantial civil penalties. *See* 215 ILCS § 5/513b1.1(a), (d); *Gobeille*, 577 U.S. at 315-18. Indeed, the PDAA's penalties are far harsher: the Vermont penalty was up to $2,000 per day, while the PDAA imposes fines five times that amount, up to $10,000 per day. 215 ILCS § 5/513b1.1(d); *Gobeille*, 577 U.S. at 318.

The core feature of the PDAA's Reporting Requirements, like the preempted law in *Gobeille*, is the requirement that PBMs report voluminous claims-level data to the state. 215 ILCS § 5/513b1.1(a); *see* pp. 4-6, *supra*. These required disclosures are extensive and cover

nearly every facet of plan administration. For the reasons set forth below, the Reporting Requirements are preempted under each of *Gobeille*'s two independent grounds.

*a. The PDAA Regulates the Same "Central Matter of Plan Administration" as the Vermont Regime that Gobeille Held Preempted*

As the Supreme Court made clear in *Gobeille*, ERISA's reporting framework is comprehensive and exclusively federal. *Gobeille*, 577 U.S. at 322-24. ERISA plans must file annual Form 5500 reports with the Secretary of Labor that disclose plan assets, liabilities, receipts, and disbursements, including paid claims. *See id.* at 321-22; Dept. of Labor, Reporting and Disclosure Guide for Employee Benefit Plans, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/reporting-annual-disclosure.pdf; Schedule H (Form 5500). Plans must also furnish summary plan descriptions, claims-procedure information, and other disclosures to participants. *Gobeille*, 577 U.S. at 321; 29 U.S.C. §§ 1021-1024, 1133. PBMs assist ERISA plans with their reporting and disclosure obligations and will, under federal requirements enacted in the Consolidated Appropriations Act of 2026, report additional claims and compensation data to the plans they serve. *See* Consolidated Appropriations Act, 2026, 119 P.L. 75; 2026 Enacted H.R. 7148; 119 Enacted H.R. 7148; 140 Stat. 173. The Secretary of Labor—and only the Secretary—is authorized to "establish additional reporting and disclosure requirements for ERISA plans" or to exempt them from those requirements. *Gobeille,* 577 U.S. at 322.

Here, the PDAA's Reporting Requirements unquestionably "compel[] plans to report detailed information about claims and plan members," the precise feature the Court found dispositive in *Gobeille*. *Id.* at 323. Because the Reporting Requirements impermissibly "govern plan reporting, disclosure, and — by necessary implication — recordkeeping," they "intrude[] upon 'a central matter of plan administration'" and are preempted by ERISA. *Id*.

*b. The PDAA Interferes with ERISA's Nationally Uniform Scheme of Plan Reporting and Disclosure*

By layering a parallel, state-specific reporting regime atop ERISA's federal framework, the PDAA's Reporting Requirements create precisely the harm *Gobeille* identified: the law subjects ERISA plans (through their administrators) to "novel, inconsistent, and burdensome reporting requirements" and threatens the regulated parties with "wide-ranging liability." 577 U.S. at 323.

If Illinois may impose 215 ILCS § 5/513b1.1, every other State may impose its own variant, with conflicting data fields, definitions, formats, deadlines, and penalty regimes. That is exactly the "patchwork" outcome ERISA was enacted to prevent: "Requiring ERISA administrators to master the relevant laws of 50 States . . . would undermine the congressional goal of 'minimiz[ing] the administrative and financial burden[s]' on plan administrators — burdens ultimately borne by the beneficiaries." *Id.* at 321 (citations and quotations omitted). *See also id.* at 323 ("Differing, or even parallel, regulations from multiple jurisdictions could create wasteful administrative costs and threaten to subject plans to wide-ranging liability"); *id.* at 324 (a plan "need not wait to bring a pre-emption claim until confronted with numerous inconsistent obligations and encumbered with any ensuing costs").

Accordingly, the PDAA's Reporting Requirements are preempted by ERISA because they interfere with national uniformity. "Pre-emption is necessary to prevent [Illinois] from imposing novel, inconsistent, and burdensome reporting requirements on plans." *Id.* at 323.

*c. The PDAA is Not Merely Incidental to Enforcement of a Valid Law*

The conclusion that the Reporting Requirements are preempted is further reinforced by the PDAA's legislative purpose. Here, as in *Gobeille*, the data collected under the PDAA's Reporting Requirements is destined for a state-curated report: the PDAA expressly directs that

the Department "may share all reports with an established institution of higher education in this State for the creation of a pharmacist dispensing cost report to be produced annually" and issued to the General Assembly. 215 ILCS § 5/513b1.1(b). Similarly, the preempted Vermont law in *Gobeille* collected data to create a state all-payer claims database "to continuously review health care utilization, expenditures, and performance in Vermont." *Gobeille*, 577 U.S. at 316.

Under this express legislative purpose, the PDAA's Reporting Requirements, like those in *Gobeille*, are not merely "incidental" to enforcement of another, non-preempted law. *Id.* at 325. Instead, the Reporting Requirements are a "direct regulation of a fundamental ERISA function." *Id.*

Because the PDAA's Reporting Requirements are definitively preempted by ERISA pursuant to *Gobeille*, PCMA has a strong likelihood of success on the merits.

## III. PCMA's Members Will Suffer Irreparable Harm Absent an Injunction

Harm is irreparable when "legal remedies are inadequate to cure it." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). "Inadequate 'does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered.'" *Id.* Here, enforcement of the Reporting Requirements will irreparably harm PCMA's members in at least three independent ways: (1) by imposing substantial, non-recoverable compliance costs or fines; (2) by compelling disclosure of confidential business information; and (3) by harming customer relationships and goodwill.

### A. Substantial, Non-Recoverable Compliance Costs

If enforcement of the PDAA's Reporting Requirements is not enjoined, PCMA's members will incur either—or both—substantial compliance costs and significant fines. Sovereign immunity bars recovery of either of those costs. *See, e.g.*, *Nowlin v. Pritzker*, 2021

U.S. Dist. LEXIS 29403, at *11 (C.D. Ill. Feb. 17, 2021). Where a regulated party is "forced to choose to incur either the civil enforcement liability of violating a preempted state law or the costs of complying with the law during the pendency of the proceedings," and sovereign immunity forecloses any recovery of those costs, the resulting injury is irreparable. *Staffing Servs. Ass'n of Ill. v. Flanagan*, 720 F. Supp. 3d 627, 640-41 (N.D. Ill. 2024) (enjoining state law based on "strong showing" of ERISA preemption and irreparable harm due to unrecoverable cost of compliance). *See also Ohio v. EPA,* 603 U.S. 279, 291-92 (2024) (finding that evidence of nonrecoverable compliance costs constituted irreparable harm); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (irreparable harm established by a plaintiff forced to choose to incur either the civil enforcement liability of violating a preempted state law or the costs of complying with the law during the pendency of the proceedings); *Ill. Bankers Ass'n v. Raoul*, 760 F. Supp. 3d 636, 664 (N.D. Ill. 2024) ("evidence of non-recoverable compliance costs" is sufficient to show irreparable harm).

Here, the Reporting Requirements impose immediate, significant, and unrecoverable administrative and financial burdens on PCMA's members. *See* Schryver Decl., ¶ 28; Chestnut Decl., ¶ 28; Harrison Decl., ¶ 28. Because penalties for noncompliance are up to $10,000 per day, PCMA's members cannot wait until the reporting deadline to act; they must begin incurring compliance costs immediately or risk substantial penalties. *See* Schryver Decl., ¶ 32; Chestnut Decl., ¶ 32; Harrison Decl., ¶ 32. These costs present far "more than a mere possibility of irreparable harm." *Flanagan*, 720 F. Supp. 3d at 641.

The costs associated with the Reporting Requirements are numerous—for example, merely to prepare the first annual report, members must identify, extract, compile, validate, and reconcile granular claims, rebate, pricing, compensation, and contract data across numerous

internal systems; build and test Illinois-specific data-extraction and reporting logic; review each affected plan contract; prepare the publicly accessible summary; and conduct privacy and information-security review—all before September 1, 2026. *See* Schryver Decl., ¶¶ 29-30; Chestnut Decl., ¶¶ 29-30; Harrison Decl., ¶¶ 29-30. This effort will require diverting significant staff time and resources to work on the Illinois report, and for some members, will require hiring additional staff or outside vendors to perform certain tasks. *See* Schryver Decl., ¶ 31; Chestnut Decl., ¶ 31; Harrison Decl., ¶ 31. To comply with the Reporting Requirements for the initial annual report deadline and moving forward, PCMA's members also anticipate needing to develop new administrative systems and data management processes, specific to the PBM's business in Illinois. *See* Schryver Decl., ¶ 6, 30; Chestnut Decl., ¶ 30; Harrison Decl., ¶ 30.

Altogether, initial costs of compliance will likely exceed hundreds of thousands of dollars and will also require significant time investment, an estimate of hundreds of additional hours dedicated solely to complying with the Reporting Requirements. *See* Schryver Decl., ¶ 29; Chestnut Decl., ¶ 29; Harrison Decl., ¶ 29.

These "staggering" compliance costs, which cannot be recovered from the State, constitute textbook irreparable harm. *See Ill. Bankers Ass'n*, 760 F. Supp. 3d at 663–64. That is especially the case here, where "[i]f Plaintiffs do not or cannot comply, they face the threat of fines" up to $10,000 per day. *Flanagan*, 720 F. Supp. 3d at 640; 215 ILCS § 5/513b1.1(d). PCMA's members thus easily satisfy the irreparable harm requirement through the costs of compliance with the PDAA's Reporting Requirements alone. *See, e.g.*, *Ohio v. EPA*, 603 U.S. at 291-92; *Morales*, 504 U.S. at 381.

### B. Compelled Disclosure of Confidential Business Information

The PDAA's Reporting Requirements also compel disclosure of confidential and proprietary information regarding the PBM's pricing structures. Disclosure of confidential business or pricing information can constitute irreparable harm warranting injunctive relief. *Life Spine, Inc.*, 8 F.4th at 539, 546 (affirming preliminary injunction where difficulty of identifying lost hospital contracts made harm irreparable, and Defendant used knowledge of Plaintiff's confidential pricing information to undermine Plaintiff's competitive position, causing "lost customers and market share, damaged goodwill and reputation, and price erosion"); *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1135, 1146 (N.D. Ill. 2019) (granting preliminary injunction and finding that financial and sales information "is confidential and derives value from its secrecy," and that inevitable disclosure would irreparably harm Plaintiff); *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1265 (7th Cir. 1995) (affirming an injunction based on irreparable harm caused by potential use of "highly confidential" strategic plans, pricing architecture, and distribution strategies which "would be extremely valuable to a competitor"—because "[k]nowing [Plaintiff's] pricing architecture would allow a competitor to anticipate [Plaintiff's] pricing moves and underbid [Plaintiff] strategically whenever and wherever the competitor so desired.").

The harms associated with disclosure of competitive business information are impossible to quantify, and "it is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'" *Life Spine, Inc.*, 8 F.4th at 546 (citing *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005)). *See also Vendavo, Inc.*, 397 F. Supp. 3d at 1144 (disclosure of confidential business information constituted irreparable harm because "it would be essentially impossible to determine the costs [Defendant] unjustly avoided"

by using confidential pricing information, "or the damage to Plaintiff's sales that could be caused").

Here, the Reporting Requirements force PCMA's members to surrender competitively sensitive business information that lies at the heart of their operations, including the specific rebate amounts received on a per-claim basis, the amounts paid to and received from pharmacies and plans per transaction, the compensation paid to brokers, consultants, and advisors, and complete copies of every contract a member has with each plan sponsor or insurer. *See* 215 ILCS § 5/513b1.1(a). PBMs must disclose this confidential business information not only to the state, but in a publicly accessible summary report. Once reported to the state, the information can be shared "with an established institution of higher education in [Illinois] for the creation of a pharmacist dispensing cost report to be produced annually." 215 ILCS § 5/513b1.1(b).

Taken together, the information required by the Reporting Requirements is likely to reveal the proprietary terms that allow PBMs to procure and offer competitive drug prices to the plans they serve. *See* Schryver Decl., ¶¶ 23-24; Chestnut Decl., ¶¶ 23-24; Harrison Decl., ¶¶ 23-24. Disclosure of this information will undermine each member's competitive position and its ability to negotiate favorable terms with various stakeholders in the prescription drug market. This is textbook irreparable harm. *See* Schryver Decl., ¶¶ 25-26; Chestnut Decl., ¶¶ 25-26; Harrison Decl., ¶¶ 25-26. *See also, e.g., Life Spine, Inc.*, 8 F.4th at 539, 546. The PDAA's cursory confidentiality provision provides little comfort. It includes neither a mechanism for enforcing the confidentiality requirement, nor details regarding how the information will be handled to maintain confidentiality. *See* 215 ILCS § 5/513b1.1(f). And there is a real and credible danger that a university-prepared, publicly available pharmacist dispensing cost report will reveal information derived from the Reporting Requirements that causes competitive harm

to PCMA's members. Thus, absent an injunction, PCMA's members will be irreparably harmed by compelled disclosure of competitive pricing information.

**C. Damage to Customer Relationships and Goodwill**

The loss of customer relationships and goodwill constitutes irreparable harm because such injuries are intangible and inherently incapable of precise monetary measurement. The Seventh Circuit has long held that harm to customer goodwill and business relationships "is not compensable in monetary damages," *Reinders Bros., Inc. v. Rain Bird E. Sales Corp.*, 627 F.2d 44, 53 & n.7 (7th Cir. 1980), and that "damage to reputation and loss of good will" are intangible harms for which "it is virtually impossible to ascertain the precise economic consequences," *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992). *See also Techtronic Indus. Co. v. Chervon Holdings Ltd.*, 395 F. Supp. 2d 720, 736–37 (N.D. Ill. 2005) (finding irreparable harm based on potential damage to the plaintiff's "reputation in the marketplace" and its relationship with a key customer); *Life Spine, Inc.*, 8 F.4th at 545–46 (loss of customers and market share in a "finite pool" of counterparties constitutes irreparable harm); *SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 715-16 (N.D. Ill. 2009) (granting Plaintiff's motion for a preliminary injunction and holding that "the endangerment of [customer] relationships can also constitute irreparable harm") (citations omitted).

Here, all of the harms caused by the Reporting Requirements, sections III.A-B, *supra*, will also damage PCMA's members' relationships with the health plans they serve and impair their ability to attract new customers.

First, significant increased compliance costs may lead to some costs being passed down to plans, and ultimately, to plan participants, which is likely to damage PCMA's members' customer relationships and goodwill. *See* Schryver Decl., ¶ 37; Chestnut Decl., ¶ 37; Harrison

Decl., ¶ 37. These increased burdens will also impair PCMA's members' ability to efficiently provide services, which will also affect business reputation and goodwill. *See* Schryver Decl., ¶¶ 29-33; Chestnut Decl., ¶¶ 29-33; Harrison Decl., ¶¶ 29-33. *See also Reinders Bros., Inc.*, 627 F.2d at 53 (finding irreparable harm where contract termination would "interfere with plaintiff's efficient servicing of a valuable segment of its clientele" and thereby harm customer goodwill).

Second, disclosure of sensitive business and health information will also harm customer relationships. The plans that PCMA's members serve do not want their confidential, competitively sensitive business information, or the personal health information of their members, disclosed to a state agency or made available to the public. *See* Schryver Decl., ¶ 36; Chestnut Decl., ¶ 36; Harrison Decl., ¶ 36.

The combination of unwanted disclosure and increased compliance costs will inevitably "endanger[]" PCMA's members' customer relationships and constitutes irreparable harm that is not compensable in monetary damages. *See, e.g., SKF USA, Inc.*, 636 F. Supp. 2d at 715-16.

## IV. The Balance of Equities and Public Interest Weigh in Favor of an Injunction

Finally, the balance of equities and public interest weigh decisively in favor of maintaining the status quo by granting injunctive relief here. Since PCMA has a near-certain likelihood of success on the merits, the burden for satisfying the equities analysis is correspondingly reduced. *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086 ("The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor[.]") (citations and quotations omitted). Even on a level playing field, however, the balance of equities and public interest here decidedly favor granting injunctive relief.

Enforcement of the PDAA's Reporting Requirements will inflict extensive and irreparable harm—not only on PCMA's members, but also on the health plans and health plan

participants they serve. *See* sections III.A-C, *supra*. On the other hand, harm from a temporary injunction is minimal, if any exists at all. At most, even if the state were to prevail in the litigation (which is unlikely), an injunction will only delay the creation of the "pharmacist dispensing cost report" until after resolution on the merits.

Defendants have no cognizable interest in—or injury resulting from—enforcement of the Reporting Requirements aside from the creation of this report. The Reporting Requirements are not, for example, necessary to enforce any other provision of law. And the State has no legitimate interest in enforcing a law that is preempted by federal statute. *See, e.g.*, *Champion International Corp. v. Brown*, 731 F.2d 1406, 1409 (9th Cir. 1984); *Iowa Ass'n of Bus. & Indus. v. Ommen*, 799 F. Supp. 3d 795, 855 (S.D. Iowa 2025).

The public interest, too, favors an injunction. PCMA anticipates that Illinois will argue that the public interest favors disclosure of plan information in aid of regulation of drug pricing and for the protection of local and independent pharmacies. But neither of these interests outweighs preemption. ERISA's preemption clause reflects Congress's considered judgment that nationally uniform plan administration best serves the interests of employers, employees, and their families. Enforcing a preempted state reporting scheme undermines that Congressional purpose. Congress has recently acted through the 2026 Consolidated Appropriations Act to impose additional reporting and disclosure requirements on PBMs and plans, thereby reducing the state's interest in doing so. Moreover, during the term of the injunction, the state will remain free to enforce other, non-enjoined provisions of the PDAA, including those not at issue in this litigation. Enjoining enforcement therefore preserves the status quo while imposing no cost on the public. Because the harm resulting from enforcing the Reporting Requirements is so great,

and the harm resulting from an injunction is minimal—if it exists at all—the balance of equities and public interest weigh in favor of the preliminary injunction.

## CONCLUSION

For the foregoing reasons, PCMA respectfully requests that the Court grant its motion and preliminarily enjoin Defendants and their agents from implementing or enforcing the PDAA's Reporting Requirements, 215 ILCS § 5/513b1.1, against PCMA's members as applied to ERISA-covered plans, pending final resolution of this action on the merits.

Dated: July 1, 2026

PHARMACEUTICAL CARE
MANAGEMENT ASSOCIATION

By its attorneys,

*/s/ Kristyn DeFilipp*

Kristyn DeFilipp (MA # 676911)
Andrew M. London (*admission pending*) (MA # 690782)
Marilyn Icsman (MA # 713232)
Foley Hoag LLP
155 Seaport Blvd.
Boston, MA 02210
Phone: (617) 832-1000
Fax: (617) 832-7000
kbuncedefilipp@foleyhoag.com
alondon@foleyhoag.com
micsman@foleyhoag.com

Andrew M. Ramage (ARDC # 6256554)
Brown Hay + Stephens
205 S. Fifth Street, Suite 1000
Springfield, IL 62701
Phone: (217) 544-8491
Fax: (217) 544-9609
aramage@bhslaw.com

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(B)(4), I hereby certify that the foregoing memorandum complies with the Rule 7.1(B)(4)(b) type volume limitation and contains 6,511 words.

*/s/ Kristyn DeFilipp*
Kristyn DeFilipp

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that she caused a true and correct copy of the foregoing to be filed using the CM/ECF filing system, which will electronically serve same upon the parties of record, on this first day of July 2026.

*/s/ Kristyn DeFilipp*
Kristyn DeFilipp