E-FILED
Monday, 20 July, 2026 07:13:49 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| PHARMACEUTICAL CARE MANAGEMENT ASSOCIATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 26-cv-3200 |
| ANN GILLESPIE, in her official capacity as Director of the Illinois Department of Insurance, and ILLINOIS DEPARTMENT OF INSURANCE, | ) | The Honorable Colleen R. Lawless |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW
IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**


INTRODUCTION ........ 1

BACKGROUND ........ 2

ARGUMENT ........ 7

I. Plaintiff has not shown that its five declarants, much less all of its members, will suffer irreparable injury in the absence of an injunction, and the balance of harms strongly favors the State. ........ 8

A. Plaintiff has not demonstrated irreparable harm to its members. ........ 9

B. The balance of harms weighs decidedly against injunctive relief. ........ 16

II. Plaintiff has no likelihood of success on the merits because the Act is not preempted by ERISA. ........ 17

III. Any injunctive relief must be narrowly tailored. ........ 21

CONCLUSION ........ 21

## INTRODUCTION

Against a backdrop of escalating prescription drug prices, which often significantly outpace inflation, and the increasing prominence of pharmacy benefit managers ("PBMs") as intermediaries between drug manufacturers, pharmacists, and patients, the Illinois General Assembly enacted the Illinois Prescription Drug Affordability Act (the "Act"). The Act is meant to curtail climbing prescription drug costs, increase transparency regarding prescription drug prices and options, and prevent diminishing access to local pharmacies, in part by addressing widespread concerns that PBMs seek to increase their own profits, often at the expense of Illinois employers and patients. The Act therefore defines and prohibits certain PBM conduct and establishes registration and reporting requirements to enforce its prohibitions. *See* 215 ILCS 5/513b1, b1.1, and b2.

Plaintiff Pharmaceutical Care Management Association ("PCMA"), on behalf of its PBM members, challenges two requirements of the Act as partially preempted by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*. Only one of these requirements is relevant to Plaintiff's pending motion for preliminary injunction – the PBM reporting provision, 215 ILCS 5/513b1.1, which requires annual reports beginning September 1, 2026. Plaintiff only challenges that provision as applied to ERISA-covered benefit plans. Dkt. 1 ¶ 8; Dkt. 8 at 1. PCMA asks this Court to preliminarily enjoin the Act's reporting requirements for *all* categories of information (even minimal data that PBMs already have reported). Not only is that request for relief overbroad, but it would improperly undermine the General Assembly's judgment in passing the Act.

Plaintiff cannot satisfy the high standard necessary for a preliminary injunction, much less one seeking such sweeping relief for all members. First, PCMA has not shown that any of its members will suffer irreparable harm if the motion for preliminary injunction is denied because

its claims of harm are unsubstantiated and speculative. In fact, as explained below, no PCMA member has shown that it will incur any nonspeculative costs that would not be incurred without injunctive relief because each member must report data for non-ERISA plans on September 1, 2026 if they have at least one covered non-ERISA plan client, regardless of whether an injunction issues. Second, the balance of harms weighs heavily in favor of the State, because any injunction would directly interfere with the State's ability to enforce its own law, regulate PBMs, and protect Illinois patients and employers from prohibited conduct over time. Third, Plaintiff is unlikely to succeed on the merits of its preemption claim because the Act has no impermissible connection with ERISA. Each factor in the preliminary injunction balancing test favors the State, and Plaintiff's motion for preliminary injunction therefore should be denied.

## BACKGROUND

*The Role of PBM Practices and Rising Drug Costs*

PBMs have entered the arena of prescription drugs, "as 'middlemen' in the pharmaceutical supply chain." *See* Improving Transparency Into [PBM] Fee Disclosure, 91 Fed. Reg. 20 at 4348 & nn.2-4 (proposed Jan. 30, 2026) (to be codified at 29 C.F.R. pt. 2550) (excerpt attached as Exhibit 1); Exhibit 2, July 1, 2025 Act Press Release (describing PBMs as "middlemen who negotiate prices between drug manufacturers, insurers, and pharmacies").[1] For years, various parties, including PBM clients, investigative reporters, and government officials, have raised concerns regarding PBM practices, questioning their often-repeated refrain that they lower

[1] The Court may take judicial notice of the external sources cited in this brief because they are public records "not subject to reasonable dispute." *Ennenga v. Starns*, 677 F.3d 766, 773-74 (7th Cir. 2012); *see* Fed. R. Evid. 201(b)(2) (permitting judicial notice of facts "whose accuracy cannot reasonably be questioned"); Fed. R. Evid. 902(6) (official documents and newspapers are self-authenticating). Thus, the Court may take judicial notice of "information publicly announced on a party's website, so long as the website's authenticity is not in dispute and is capable of accurate and ready determination." *Cesca v. W. Ill. Univ. Bd. of Trs.*, No. 23 C 4043, 2024 U.S. Dist. LEXIS 7265, at *2 n.1 (C.D. Ill. 2024) (citations omitted); *see also Bova v. U.S. Bank, N.A.*, 446 F. Supp. 2d 926, 930 n.2 (S.D. Ill. 2006) ("The Court may of course judicially notice public records and government documents, including those available from reliable sources on the Internet.").

prescription drug costs for those they serve. *See* Exhibit 1, 91 Fed. Reg. 20 at 4348-55 & nn.2-81; Exhibit 3, Rebecca Robbins & Reed Abelson, *The Opaque Industry Secretly Inflating Prices for Prescription Drugs*, N.Y. TIMES (June 21, 2024).[2] PBMs are often affiliated with health insurance companies, pharmacies, and internal or external consultants or brokers; the financial and contractual webs linking those entities are tangled and opaque to outsiders, due to a lack of regulation and little meaningful transparency, even to PBM clients. *See* Exhibit 1, 91 Fed. Reg. 20 at 4349-55 & nn.39-51, 4374-76 & nn.152-54; Exhibit 3, *Robbins*, *et al*., at 5-13. Moreover, PBMs engage in ever-changing profit-wrangling machinations, including undisclosed financial arrangements with drug manufacturers. Exhibit 1, 91 Fed. Reg. 20 at 4352-55 & nn.52-85, 4376-78 & nn.162-193; Exhibit 3, *Robbins*, *et al*., at 2-3.

PBMs have long negotiated "rebates" (a discount off the "sticker price" of prescription drugs) from drug manufacturers. Historically, PBMs would retain at least part of the rebate and might pass any remainder on to a client or patient. Exhibit 1, 90 Fed. Reg. 20 at 4376-77; Exhibit 3, *Robbins*, *et al*., at 7-8. PBMs may also negotiate price protections from drug manufacturers that can lead those manufacturers to strategically increase drug prices. Exhibit 1, 90 Fed. Reg. 20 at 4353-55, 4364, 4377. PBM clients sought more pass-throughs of rebate savings, while the federal government considered deeming drug rebates to be improper kickbacks, and PBMs then pivoted, creating subsidiary affiliates to contract directly with drug manufacturers for rebates and begin charging separate fees to evade rules forbidding rebates, and client contracts requiring pass-throughs of rebates. Exhibit 3, *Robbins*, *et al*., at 9-10. Some PBMs also engage in spread-pricing or co-pay clawbacks. Exhibit 1, 90 Fed. Reg. 20 at 4377-78. Spread-pricing lets PBMs pocket the "spread" or difference between payments received from PBM clients and the lower amount the

---

[2] Exhibit 3 is *available at* https://www.nytimes.com/2024/06/21/business/prescription-drug-costs-pbm.html, at 1-16 (last visited July 20, 2026).

PBM pays to the pharmacy for a drug sale or co-pay; co-pay clawbacks let PBMs snatch the difference between the amount a patient is charged as a co-pay for a prescription drug and the lower total acquisition cost of the drug. Exhibit 1, 90 Fed. Reg. 20 at 4377-78. PBMs also may have undisclosed arrangements with consultants or brokers, manipulate specialty drug formularies due to contractual deals with and high rebates from drug companies, require patients to use affiliated specialty pharmacies for PBMs' own benefit; and excessively mark up the price of generic drugs. *Id*. at 4378.

Thus, even where PBMs succeed in negotiating significant decreases in the prices of prescription drugs, often those savings are not realized by PBM clients or patients, and patients may be harmed through delays in or prevention from obtaining medications. Exhibit 3, *Robbins*, *et al*., at 2-3. The *New York Times* cited numerous examples of PBMs profiting at the expense of clients or patients, including one PBM overcharging an Oklahoma state employee health plan by more than $120,000 for a single patient's cancer drug and also forcing an Illinois cancer patient to pay hundreds of unnecessary dollars by requiring her to use a more expensive pain medication. *Id*. at 3. Another PBM sought to charge a New Jersey retiree $211 for a three-month allergy drug supply Costco priced at just $22. *Id*.; *see also id*. at 11-15 (citing additional examples). Similarly, PBMs may urge employers to cover only brand-name versions of drugs, rather than the less expensive generic, leading to one patient's cost rising from $60 for a generic inhaler to $300 for the brand-name version. *Id*. at 7-8. Criticizing PBMs for "sav[ing] money off bogus inflated prices that should not exist in the first place," an interviewee labeled PBMs both "the arsonist[s] and firefighter[s] of high drug prices." *Id*. at 7.

*The Act Holds PBMs Accountable and Provides Clarity for Consumers*

Heeding and sharing concerns regarding the role of PBMs and their effects on Illinois residents and employers, the Illinois General Assembly passed the Act to hold PBMs

"accountable" by, in part, banning "predatory practices" like those identified above. Exhibit 2 at 1-2; 215 ILCS 5/513b1(a), (f-10). The Act applies to most ERISA and non-ERISA plans, protects consumers' ability to use prescription coupon and discount programs and access information about cheaper drug options, and prohibits retaliation by PBMs. 215 ILCS 5/513b1(a), (d)-(f), (f-15), (g), (i)(1)-(2), (4), (l). The Act also imposes related PBM reporting requirements so that PBM practices can be monitored and the Act can be enforced. 215 ILCS 5/513b1.1.

Beginning September 1, 2026, PBMs must submit an annual report that "only contain[s] summary health information," ensuring that "plan, coverage or covered individual information remains private and confidential." 215 ILCS 5/513b1.1(a), (b).[3] Reports must include:

- The total number of covered individuals and number of Illinois residents who are covered individuals;
- A list of drugs with descriptive information;
- The number of drug-related claims;
- Dosage units;
- Dispensing channel used; and
- The average wholesale acquisition cost per drug.

215 ILCS 5/513b1.1(a)(1)(A)-(G).

In addition to that general information, the Act seeks other information to illustrate whether PBMs engage in prohibited conduct, including:

- Receipts by the plan of rebates, fees, or discounts related to drug utilization or spending;
- Total plan gross spending on drugs;
- Total plan net spending;
- The rebate amount the PBM received and how much was passed on to plans or individuals;
- Compensation to brokers, consultants and advisors;

[3] Moreover, the Department's recent guidance to PBMs does not seek any such identifying information. *See* Exhibit 4, Declaration of Robert E. Havens, Jr., ¶ 15 & Exhibit A.

- Co-payment assistance information collected from drug manufacturers, if any;
- The PBMs' contracts with plan sponsors or insurers;
- An explanation of any encouragement or requirement for individuals to use affiliated pharmacies;
- The percentage of drugs charged by and list of drugs dispensed by such affiliated pharmacies, along with their associated costs; and
- Some per-transaction data, like the amount the plan paid the PBM for reimbursement of a drug and service and the amount the PBM paid for pharmacists' services and drugs to the plan.

215 ILCS 5/513b1.1(a)(2)-(11).

A PBM must also provide a "summary version of the report described in" § 513b1.1(b)(3) that is "marked for public access." 215 ILCS 5/513b1.1(b)(4). The Department of Insurance "may share all reports with an established institution of higher learning for the creation of" an annual "pharmacists dispensing cost report" including a "survey of the average cost of dispensing a prescription for pharmacists in Illinois" for the General Assembly. 215 ILCS 5/513b1.1(b).

"Except for the summary version, the annual reports submitted by [PBMs] shall be considered confidential and privileged for all purposes" and are not subject to the Freedom of Information Act ("FOIA"), "subpoena by any private party," or "admissible as evidence in a civil action." *Id*. § 513b1.1(f). A PBM's "failure ... to submit all required elements in an annual report … may result in a fine … not to exceed $10,000 per day, per offense," 215 ILCS 5/513b1.1(d), but a PBM may seek "a filing submission extension" of the reporting due dates. 215 ILCS 5/513b1.1(c). A PBM "found in violation of" § 513b1.1(a) or (b)(4) may request a hearing. 215 ILCS 5/513b1.1(e).

Pursuant to 215 ILCS 5/513b(f), PBMs, including the declarants, have been reporting one component of the information required within 215 ILCS 5/513b1.1(a): the total number of covered individuals and number of Illinois residents who are covered individuals. *See* 215 ILCS

5/513b2(f); 215 ILCS 5/513b1.1(a)(1)(B); Exhibit 4 ¶¶ 6-11. That information is necessary to calculate the fee set forth in 215 ILCS 5/513b2(f), which is not challenged here. *Id.* ¶ 13.

*The Parties*

The Illinois Department of Insurance ("IDOI" or "the Department") recently issued guidance to PBMs on how to seek an extension of time to report and on the information IDOI seeks. *See* Exhibit 4 ¶ 15 & Exhibit A; *see also* 215 ILCS 5/513b1.1(a)(1)(G), (b)(2). In any case, IDOI routinely receives and maintains the confidentiality of personal patient identifying information and even proprietary business information. *See, e.g.,* 215 ILCS 125/4-6(c)(5); 50 Ill. Adm. Code 926.40(b)(3) and (d); 815 ILCS 530/45; 215 ILCS 5/132.5(f); 215 ILCS 5/129.8; 50 Ill. Adm. Code 2051.240(g).

Plaintiff PCMA is a PBM trade association that has funded studies in support of its members. *See* 91 Fed. Reg. 20 § E8 & nn.224-225 (also noting assumptions and limitations of PCMA studies). PCMA identifies twenty members on its website, although it is unclear if this is a complete list.[4]

**ARGUMENT**

Injunctive relief is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 973 (1997) (internal quotations omitted). A preliminary injunction is "never awarded as of right" and "never to be indulged in except in a case clearly demanding it." *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020).

A plaintiff "seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

[4] *See* PCMA, "Members," *available at* https://www.pcmanet.org/about/members/ (last visited July 20, 2026).

balance of equities tips in his favor, and that an injunction is in the public interest." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). If the plaintiff satisfies all these requirements, then the court must weigh the harm that the plaintiff will incur without an injunction against the harm to the defendant if one is entered, and "consider whether an injunction is in the public interest." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (internal quotations omitted). This analysis is done on a "sliding scale"— if the plaintiff is less likely to win on the merits, the balance of harms must weigh more heavily in its favor, and vice versa. The court should pay "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008).

Finally, an injunction "must be narrowly tailored to remedy the specific harm shown." *Neb. Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (cleaned up); *see also Vaughn v. Walthall*, 968 F.3d 814, 817 (7th Cir. 2020) (remanding case and noting that any injunction "must be narrowly tailored to any violations").

## I. Plaintiff has not shown that its five declarants, much less all of its members, will suffer irreparable injury in the absence of an injunction, and the balance of harms strongly favors the State.

Plaintiff's[5] motion should be denied because it has not shown that its members will suffer irreparable harm without an injunction. Plaintiff has not met its burden to show that an injunction will prevent harm to its members because, with or without an injunction, every PBM contracting with most non-ERISA-covered plans, *see* 215 ILCS 5/513b1(a) (noting exclusions), must report on its non-ERISA-covered plans in Illinois pursuant to the Act on September 1. Plaintiff has not shown that even one member would not have to report on September 1, much less that any of them

[5] Defendants do not address Plaintiff's standing in this response to Plaintiff's preliminary injunction motion.

would incur truly irreparable harm in the absence of an injunction. Moreover, the balance of harms weighs strongly *against* granting a preliminary injunction.

**A. Plaintiff has not demonstrated irreparable harm to its members.**

Plaintiff does not establish that any member will suffer irreparable harm in the absence of an injunction. Regardless of how likely a plaintiff is to succeed on the merits of a claim, the Court may enter a preliminary injunction only if the party also shows irreparable injury is likely without an injunction. *Winter*, 555 U.S. at 21-22. "[S]uch a finding 'must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store.'" *Insulet Corp. v. EOFlow, Co.*, 104 F.4th 873, 883 (Fed. Cir. 2024) (citation omitted). The *possibility* of irreparable harm is not sufficient to warrant a preliminary injunction. *Orr*, 953 F.3d at 502. Nor is it enough merely to show that a party may incur some monetary costs that are not recoverable in absence of a preliminary injunction; such costs must exceed a non-critical disruption in cash flow, loss of profits, and must be certain, great and actual, as well as imminent. *See McHenry Cnty v. Raoul*, No. 21-3334, 2022 U.S. App. LEXIS 6097, at *3 (7th Cir. Jan. 12, 2022) (finding plaintiffs suing State had not shown feared economic losses were "imminent irreparable harm" without showing "they will lose [permanent] substantial revenue absent an injunction" and refusing to stay statute's enforcement pending appeal); *Nat'l Mining Ass'n v. Jackson,* 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (monetary loss can constitute irreparable harm if it "threatens the survival of the movant's business").

**1. Any monetary injury is not irreparable harm here.**

Plaintiff insists that its at-least twenty PBM members will all incur an irreparable harm of "substantial, non-recoverable compliance costs" from the Act's reporting requirements. Dkt. 8 at 15. But "injury resulting from attempted compliance with government regulation ordinarily is not irreparable harm." *American Hosp. Assoc. v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) ("Any

time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it could hardly be contended that proof of such an injury, alone, would satisfy the requisite for a preliminary injunction. Rather, in cases like these, courts ought to harken to the basic principle of equity that the threatened injury must be, in some way, 'peculiar.'"). Plaintiff must show that any losses are extraordinary and impact its members' survival. *See, e.g., Raoul*, 2022 U.S. App. LEXIS 6097, at *3; *Jackson,* 768 F. Supp. 2d at 50.

Plaintiff does not meet its burden. Plaintiff limits its challenge here to ERISA-covered plans, as it must, given that its claim is based on ERISA preemption. This means that, with or without the requested preliminary injunction, PBMs that contract with any non-ERISA-covered plans must incur whatever start-up costs are required to file reports by September 1. In Plaintiff's words, those PBMs will have to "identify, extract, compile, validate, and reconcile granular claims, rebate, pricing, compensation, and contract data across numerous internal systems; build and test Illinois-specific data-extraction and reporting logic; review each affected plan contract; prepare the publicly accessible summary; and conduct privacy and information-related security review." *See* Dkt. 8 at 16-17. Thus, to suggest that any PBM member will incur potential irreparable harm in the absence of the requested injunction, Plaintiff would have had to introduce evidence that any PBM (1) services only ERISA plans (or itemize costs in a manner Plaintiff has not attempted to do); or (2) would face such a substantial cost for reporting for its ERISA-covered plans (as opposed to its non-ERISA plans) that members' bottom lines truly are affected, *see, e.g., Raoul*, 2022 U.S. App. LEXIS 6097, at *3; *Jackson,* 768 F. Supp. 2d at 50.

Despite having had more than six months to prepare its filing, Plaintiff does not make that showing for any member. PBM Navitus Health Solutions, LLC concedes that only "approximately six" of the "at least 10 health plans" it contracts with in Illinois are self-funded (ERISA covered) plans. Dkt. 10 ¶¶ 2, 29. The only logical conclusion is that Navitus must incur start-up costs to

comply with its reporting obligations for its remaining four non-ERISA covered plans by September 1, no matter what happens on this motion or in this case. Several of Plaintiff's PBM members—Optum Rx, Inc., Prime Therapeutics LLC, Prime Therapeutics Management, LLC, and Express Scripts, Inc. (*see supra* n.4)—alleged in another case that they service both ERISA and non-ERISA plans in Illinois. *See* Exhibit 5, *Optum Rx, Inc., et al., v. Gillespie, et al*., No. 2026 L 50157 (Cook Cnty. Cir. Ct.), Complaint ¶¶ 59-63 (Mar. 3, 2026). Thus, they, too, must submit reports under the Act on September 1, regardless of what happens here. PCMA's late-submitted declarations for Optum and Prime Therapeutics, Dkt. 20, 21, do not alter that conclusion.

Similarly, ProAct, Inc. states only that it contracts with "approximately twelve self-funded health plans in Illinois" without disclosing the total number of plans it contracts with in Illinois or the total number of self-funded health plans in Illinois that are ERISA-covered. *See* Dkt. 9 ¶¶ 2, 29. This declaration fails to establish that ProAct would only incur start-up reporting costs if no injunction enters. TrueRx Management Services, Inc.' submission comes closer to the mark, asserting that it "contracts with forty-three (43) health plans in Illinois," of which "*approximately* forty-three (43)" are "self-funded health plans." Dkt. 11 ¶¶ 2, 29 (emphasis added). But TrueRx's hedging regarding how many of the Illinois plans it serves are self-funded (ERISA covered) plans cannot meet Plaintiff's burden to show that TrueRx would not incur start-up reporting costs regardless of an injunction; nor has it declared that all of its Illinois self-funded health plans are ERISA-covered.

Plaintiff therefore has not shown that any member, much less multiple members, would suffer irreparable harm due to start-up reporting compliance costs that they would not otherwise have to incur without an injunction, given that each member must file reports for non-ERISA plans covered by the Act on September 1. Nor has Plaintiff shown that any costs for reporting pursuant to the Act are "peculiar" or "threaten the survival of" any PBM's business. *Harris*, 625 F.2d at

1331; *Raoul*, 2022 U.S. App. LEXIS 6097, at *3; *Jackson,* 768 F. Supp. 2d at 50. Furthermore, any claim of irreparable harm is undermined by the Act's provision allowing PBMs to seek an extension of the reporting requirements. 215 ILCS 5/513b(c); *see also* Exhibit 4 ¶ 12.

Even if Plaintiff had shown that a single PBM member (out of the five who submitted declarations and/or its twenty total disclosed members) would face irreparable harm in the absence of a preliminary injunction, it is inappropriate to grant an injunction to *all* of Plaintiff's members, as Plaintiff requests, where just one shows irreparable harm. In *Council for Opportunity in Education v. United States Department of Education*, an organization proceeding on a theory of associational standing submitted declarations showing that some members faced irreparable injury absent an injunction regarding funding. No. 25-cv-3491, 2026 U.S. Dist. LEXIS 116864, at *19-22 (D.D.C. May 27, 2026). The court ordered injunctive relief for those members but declined to extend injunctive relief to members for whom no injury was shown. *Id*. The court explained: "That an organization proceeds on a theory of associational standing … does not alter the[ ] requirements" that a "party seeking a preliminary injunction bears the burden of substantiating, with evidence, that the claimed injury is certain, imminent, great, and beyond remediation" because the "standing inquiry is distinct, albeit related, from that of fashioning any preliminary relief." *Id*. at *19-20 (citing *Taylor v. Resol. Tr. Corp.*, 56 F.3d 1497, 1508 (D.C. Cir. 1995)).

**2. Any other asserted injuries are not irreparable harm, either.**

Plaintiff next asserts that "disclosure of confidential business or pricing information can constitute irreparable harm." Dkt. 8 at 18. Although that may be true, Plaintiff has not established such harm. The cases Plaintiff cites do not support its position that statutory reporting to a state agency might constitute such harm. For instance, *Life Spine, Inc. v. Aegis Spine, Inc.*, involved a trade secret claim by one commercial entity against its distributor, which then allegedly "funneled information about [plaintiff's product] to [defendant's] parent company … to help [the parent

company] develop a competing …. device" that was soon to hit the market. 8 F.4th 531, 534-35 (7th Cir. 2021). *Vendavo, Inc. v. Long*, too, involved a trade secret claim that plaintiff's former employee stole trade secrets for her new employer. 397 F. Supp. 3d 1115, 1123 (N.D. Ill. 2019). And in *PepsiCo, Inc. v. Redmond*, a former employee was enjoined from divulging trade secrets, confidential information, or assuming certain related duties in a new job. 54 F.3d 1262, 1263 (7th Cir. 1995). In each of these cases, the confidential information was within reach of a business competitor, not about to be provided to a regulatory agency under state law. None of Plaintiff's cases suggests that producing information to a state agency constitutes irreparable harm. Moreover, no member states how such disclosures could reveal truly proprietary information considering the Act's express confidentiality provisions. *See* 215 ILCS 5/513b1.1(b)(2), (f). Plaintiff's vague assertion does not show irreparable injury to any member.

Plaintiff also speculates that reporting might "cause[ ] competitive harm" to Plaintiff's members (Dkt. 8 at 19-20), but Plaintiff's evidence does not support this claim. The mere potential misuse of disclosures is insufficient to warrant injunctive relief. *See Correll Acct., Inc. v. Autymate, LLC*, No. 24-6032, 2024 U.S. App. LEXIS 29855, *5 (6th Cir. Nov. 22, 2024) ("Autymate's fear that UniFi might misuse proprietary information is insufficient; to merit injunctive relief, "an injury must be both certain and immediate, not speculative or theoretical") (cleaned up); *AARP v. U.S. EEOC*, 226 F. Supp. 3d 7, 21 (D.D.C 2016) (AARP did not meet its burden to show irreparable harm where "none of the three member declarations" it had "submitted ... indicates that irreparable harm from [ ] disclosure is in fact likely to occur").

Plaintiff next theorizes that members' customer relationships might be harmed if "confidential, competitively sensitive business information, or personal health information of their members" is disclosed to a state agency or the public. Dkt. 8 at 18. Again, though, the Act assures that no "personal health information" is shared – all disclosures are either numerical or deidentified

to maintain the "priva[cy] and confidential[ity]" of "plan, coverage, or covered individual information." 215 ILCS 5/513b1.1(b)(2). Plaintiff does not specify any "confidential, competitively sensitive business information" that would be revealed through the reporting. Nor does it justify its speculation that disclosures, which the Act protects as "confidential" and exempts from disclosure under FOIA or use in civil proceedings, would cause competitive harm to member PBMs or their clients. Further, none of Plaintiff's declarations assert that any health plan has complained about the Act's reporting requirements. And why would they? Plans themselves have an interest in the information, which Plaintiff's members' websites acknowledge in touting their "transparency" to potential clients. *See* Exhibit 6, Declaration of Catharine Debelle (attaching selected PCMA member webpages). That self-proclaimed "transparency" may be misleading, of course. Exhibit 3, 91 Fed. Reg. 20 at 4351-52 & nn. 44-48 (noting that plan fiduciaries "often lack a clear understanding of how PBMs operate and how they receive compensation"); *see also supra* 2-4. Plaintiff has not shown irreparable harm from the disclosures under the Act.

**3. PBMs have been reporting some data for months.**

Plaintiff failed to mention that PBMs already reported one category of information, "the total number of covered individuals and number of Illinois residents who are covered individuals." *See* 215 ILCS 5/513b2(f), 513b1.1(a)(1)(B). This reporting requirement is minimal; Plaintiff cannot show irreparable harm from members continuing this reporting. And, contrary to Plaintiff's assertion that "the state will remain free to enforce other, non-enjoined provisions of the PDAA" should an injunction enter, Dkt. 8, at 22, if PBMs do not continue to submit that non-burdensome information, the State would be prevented from collecting the fee set forth in 215 ILCS 5/513b2(f), which Plaintiff does not challenge here, as to ERISA-covered plans. The Court should avoid this unintended consequence.

**4. Plaintiff's delay in seeking an injunction undercuts any suggestion of irreparable harm.**

Even if Plaintiff could establish irreparable harm, the threat of irreparable harm does not automatically trigger a preliminary injunction. *Del. State Sportmen's Ass'n v. Del. Dep't of Safey & Homeland Sec*., 108 F.4th 194, 197 (3d Cir. 2024). The purpose of a preliminary injunction is not to prevent interim harm, but to prevent irreparable harm that "threatens to moot a case, as when one party's conduct could destroy the property under dispute, kill the other party, or drive it into bankruptcy, for otherwise a favorable final judgment might well be useless." *Id* at 201. Where the "plaintiff's alleged injury does not threaten to moot the case" the "wiser course" is "often, perhaps usually," to deny a preliminary injunction. *Id*. And, where "the complained of costs should already have been incurred" by the date of a preliminary injunction hearing "if [those regulated] hoped to be in compliance with the regulations by September 1, the day the regulations became effective" that fact, too, is properly weighed against the movant. *Harris*, 625 F.2d at 1331.

Plaintiff has not suggested this case will become moot in the absence of an injunction. And Plaintiff's lengthy delay in filing this case and moving for an injunction—more than six months after the Act was enacted on December 2, 2025, and just over two months before its September 1 reporting date, further "undercuts [its] claims of irreparable harm" and "may be considered as circumstantial evidence that the potential harm to [Plaintiff's members] is not irreparable or as great as claimed." *Fenje v. Feld*, No. 01 C 9684, 2002 U.S. Dist. LEXIS 9492, at *6 (N.D. Ill. May 28, 2002). In a similar situation, a court found that the plaintiff's delay in waiting five months after the promulgation of challenged rules to file suit, despite knowing the rules would become applicable just over two months later, "placed both this Court and the defendant in a difficult position, given the looming applicability date," and also "undermine[d] its argument that an injunction is urgently needed to prevent irreparable harm to its members." *AARP*, 226 F. Supp. 3d

at 21. Nothing prevented Plaintiff from filing this lawsuit for injunctive relief half a year ago. This further supports that Plaintiff has failed to demonstrate irreparable harm.

**B. The balance of harms weighs decidedly against injunctive relief.**

Under the "balance of harms" portion of the analysis, Plaintiffs must establish that "the harm [it] would suffer without the injunction is greater than the harm that preliminary relief would inflict on the defendants." *Mich. v. U.S. Army Corps of Eng'r*, 667 F.3d 765, 769 (7th Cir. 2011). And where Plaintiff's claim is unlikely to succeed on the merits, as discussed below, Plaintiff "must compensate for the lesser likelihood of prevailing by showing the balance of harms tips *decidedly* in favor of the movant." *Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 826 n.5 (7th Cir. 1998) (emphasis in original). The court also should consider whether a preliminary injunction would cause harm to the public interest. *Platinum Home Mort. Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 726 (7th Cir. 1998). When the government is the opposing party, the balance of the equities and the public interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435-36 (2009).

Here, the State has a strong interest in protecting Illinois patients and employers from the predatory practices of PBMs that the Act is designed to combat. The Act followed and was meant to counteract years of drug cost increases that many attribute to the PBM practices, including undisclosed self-serving (for the PBM or affiliates) contracts with drug companies; a lack of transparency of relationships with affiliates, consultants, and brokers; and a long-standing failure to protect clients and plan participants. *See supra* 2-4. The reporting provisions in 215 ILCS 5/513b1.1 permit monitoring of PBM practices and enforcement of the Act. This is a weighty interest.

Moreover, the State has a strong interest in enforcing its own democratically enacted laws. *Del. State Sportmen's Ass'n*, 108 F.4th at 205. "Any time a State is enjoined by a court from

effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Rehnquist, J., in chambers) (quotations omitted). "Without the clarity of a full trial on the merits," the Court should "err on the side of respecting state sovereignty." *Del. State Sportmen's Ass'n*, 108 F.4th at 206. This strong preference against such intrusive injunctive relief is primarily founded on "delicate issues of federal state relationships," which are premised on "the principles of equity, comity, and federalism." *Rizzo v. Goode*, 423 U.S. 362, 380, 379 (quotations omitted).

The State's interests in protecting its citizens and in enforcing its own laws far outweighs the Plaintiff's speculation that any member will face "irreparable" injuries. The preliminary injunction should be denied for this reason as well.

## II. Plaintiff has no likelihood of success on the merits because the Act is not preempted by ERISA.[6]

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits." *Winter*, 555 U.S. at 20. A plaintiff must make a "strong" showing that he will succeed on the merits, meaning he must demonstrate how he proposes to prove the key elements. *Ill. Republican Party*, 973 F.3d at 762.

Here, Plaintiff fails to establish that it is likely to succeed on its reporting claim. As an initial matter, the IDOI, an agency of the State of Illinois, "*is* the state for purposes of the eleventh amendment," *Kroll v. Board of Trustees of Univ. of Ill.*, 934 F.2d 904, 907 (7th Cir. 1991), and ERISA does not abrogate the State's Eleventh Amendment immunity. *Darne v. Dep't of Rev.*, 137 F.3d 484, 488 (7th Cir. 1998). Plaintiff cannot obtain injunctive or declaratory relief against the Department, which should be dismissed as a party.

[6] Given the time and space constraints upon Defendants in responding to this motion, Defendants have not here briefed every possible defense to Plaintiff's claim.

In any event, ERISA does not preempt the reporting requirements of the Act, which are ancillary to the Act's prohibition against PBM practices that conceal the availability of more affordable prescription drug alternatives and the true costs of prescription drugs—practices that decrease patient alternatives while increasing patient costs. Without annual reporting, Illinois would not be able to determine whether PBMs are complying with the Act, much less achieve the Act's aims of lower prescription drug costs and greater choice for Illinois patients.

ERISA imposes a complex regulatory scheme upon the employee benefit plans within its reach, 29 U.S.C. § 1003(a), and preempts "state laws insofar as they relate to any employee benefit plan covered by ERISA." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (cleaned up); 29 U.S.C. § 1144(a). Despite this "expansive" language, *id.*, a law "relates to" an ERISA plan only if it "has a connection with or reference to such a plan." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86 (2020) (citation omitted). Plaintiff does not argue that the Act has a preemptive "reference to" an ERISA plan, *see* Compl. ¶¶ 66-71; Dkt. 8 at 8, because the Act "does not act immediately and exclusively upon ERISA plans." *Rutledge*, 592 U.S. at 88-89; *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 304 (1st Cir 2005) (holding that, where state statute "applies regardless of whether PBMs are serving ERISA plans," it does not "refer to" plans under ERISA).

Plaintiff instead incorrectly asserts that the Act has an impermissible "connection with" ERISA plans. Dkt. 8 at 8. The critical determination for "connection with" preemption is "whether a state law governs a central matter of plan administration or interferes with nationally uniform plan administration." *Rutledge*, 592 U.S. at 86-87 (cleaned up). Broadly speaking, state laws that require payment of specific benefits or bind plan administrators to specific rules for determining beneficiary status are preempted, as are laws under which "'acute, albeit indirect, economic effects … force an ERISA plan to adopt a certain scheme of substantive coverage." *Id.* (citations

omitted). But "not every state law that affects an ERISA plan or causes some disunity in plan administration has an impermissible connection with an ERISA plan." *Id*.

Plaintiff suggests that the Act is "striking[ly] similar[ ] to" the Vermont statute preempted in *Gobeille v. Liberty Mutual Ins. Co*., 577 U.S. 312 (2016), Dkt. 8 at 12-15, but that is incorrect. Vermont's law sought to "maintain an all-inclusive health care database" and imposed upon various entities a "reporting regime" that "govern[ed] plan reporting, disclosure, and …. recordkeeping." *Gobeille*, 577 U.S. at 323. Although the *Gobeille* Court found those provisions to be preempted, its holding is limited to "state reporting laws like Vermont's." *Id*. The Court expressly reserved the possibility that, for a state law, "the enforcement of which necessitates incidental reporting by ERISA plans," the "analysis may be different" from that for Vermont's "reporting regime." *Id*.

Following this lead, courts have upheld against ERISA preemption challenges state laws that impose reporting requirements "incidental" to a statute's core purposes. Following remand of an earlier decision "for further reconsideration in light of *Gobeille*," *Self-Ins. Inst. of Am., Inc. v. Snyder*, 577 U.S. 1186 (2016), the Sixth Circuit upheld a Michigan law imposing "a tax on all 'paid claims' by 'carriers' or 'third party administrators' for services rendered in Michigan for Michigan residents" with related reporting requirements, including quarterly returns to the tax department and maintenance of records. *Self-Ins. Inst. of Am., Inc. v. Snyder*, 827 F.3d 549, 553, 557 (6th Cir. 2016). The "core" of the state law, the Sixth Circuit explained, was "to collect taxes," not "amass data," and "incidental" "reporting and recording keeping" components "facilitate[d] collection." *Id*. at 558.

Similarly, the Eighth Circuit emphasized that "[n]ot every state law imposing a reporting requirement is preempted." *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 969 (8th Cir. 2021). It upheld against an ERISA preemption challenge a North Dakota law that imposed on-demand

reporting requirements on PBMs, including reporting: (1) "the processor control number, bank identification number, and group number for each pharmacy network established or administered by a [PBM]," which were "to enable [a] pharmacy to make an informed decision"; and (2) " any difference between the amount paid to a pharmacy and the amount charged" to a "plan sponsor contracted payer" where "a [PBM] has an ownership interest, either directly or through an affiliate or subsidiary, in a pharmacy." *Id*. at 964-66, 68-69 (finding that reporting requirements had a "*de minimis* economic effect[ ] and impact on the uniformity of plan administration across states"). *See also Iowa Ass'n of Bus. & Indus. v. Ommen*, 799 F. Supp. 3d 795, 841-42 (S.D. Iowa 2025) (distinguishing *Gobeille* and finding that plaintiff was not likely to succeed on ERISA preemption claims regarding PBM quarterly reporting requirements).

Like the statutes at issue in *Snyder* and *Wehbi*, the Act's reporting requirement is incidental to the Act's purposes (here, to protect Illinois patients from deceitful and harmful PBM practices in Illinois). In touting the Act's purposes after he signed it, Governor Pritzker emphasized not reporting requirements but the "infect[ion]" of "our healthcare system … by profit-seeking middlemen and predatory actors looking to make an extra dime at the expense of Illinois patients." Exhibit 2 at 2. Although the reporting requirements serve an important purpose—to illustrate whether and how the Act's provisions may affect Illinois health benefit plans, covered individuals, and pharmacies over time—they are incidental to the Act's overarching goals.

Telling, too, is Plaintiff's hedging regarding who must report. Although Plaintiff asserts that PBMs "assist" plans with ERISA reporting obligations, Dkt. 8 at 13, *Gobeille* did not look to a party's role in "assist[ing] ERISA plans" with reporting or disclosures or future reporting requirements. There is no other ground for preemption. *See Rowe*, 429 F.3d at 305 (rejecting argument that state statute regarding PBMs "conflict[ed] with the 'exclusive' remedial scheme set forth by Congress in ERISA … and is therefore preempted").

## III. Any injunctive relief must be narrowly tailored.

As discussed above, *supra* 7-15, Plaintiff's requested relief is not narrowly tailored. Any preliminary injunctive relief must be narrowly crafted to apply only to members who face irreparable harm, should specify to which PBMs it applies, and should carve out reporting requirements, § 513b1.1(a)(1)(B), necessary for the State to enforce its fee set forth in § 513b2(f), and which PBMs have already reported.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff's motion for a preliminary injunction.

Respectfully submitted,

KWAME RAOUL
Attorney General of Illinois

/s/ Deborah M. Beltran
Deborah Morgan Beltran
Catharine Debelle
Assistant Attorneys General
Office of the Illinois Attorney General
Government Representation Division
115 South LaSalle Street
Chicago, Illinois 60603
773-519-1757
312-720-5450
deborah.beltran@ilag.gov
catharine.debelle@ilag.gov

*Counsel for Defendants*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(B)(4), I hereby certify that the foregoing memorandum complies with the Rule 7.1(B)(4)(b) type volume limitation and contains 6936 words.

*/s/ Deborah M. Beltran*
Deborah Morgan Beltran

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that she caused a true and correct copy of the foregoing to be filed using the CM/ECF filing system, for electronic service upon the parties of record on this 20th day of July, 2026.

*/s/ Deborah M. Beltran*
Deborah Morgan Beltran