E-FILED
Wednesday, 30 September, 2026 05:17:12 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT FOR
THE CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| PHARMACEUTICAL CARE MANAGEMENT ASSOCIATION, | ) | |
| Plaintiff, | ) | Case No. 26-CV-03200 |
| v. | ) | |
| ANN GILLESPIE, In her official capacity as Director of the Illinois Department of, Insurance, and ILLINOIS DEPARTMENT OF INSURANCE | ) | |
| Defendants. | ) | |

**ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF**

Defendants the Illinois Department of Insurance ("IDOI" or "the Department") and Ann Gillespie, by her attorney KWAME RAOUL, Attorney General of the State of Illinois, answers Plaintiff's Complaint for Declarative, Injunctive, and Other Relief as follows:

## INTRODUCTION

1. For more than fifty years, the federal Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, has preempted state laws that "relate to" employee benefit plans covered by ERISA. 29 U.S.C. § 1144(a).

**ANSWER: Defendants admit the allegations of this paragraph.**

2. This case concerns the Illinois Prescription Drug Affordability Act (the "PDAA"). The PDAA was signed into law on July 1, 2025. The law imposes sweeping mandates and restrictions on many different types of health plans, including those covered by ERISA.

**ANSWER: Defendants admit that Plaintiff asserts a claim related to the Illinois Prescription Drug Affordability Act (the "PDAA"), which was signed into law on July 1, 2025. Defendants deny all remaining allegations of this paragraph.**

3. In 2016, the Supreme Court held that state laws requiring ERISA plans or their agents to make detailed disclosures to state agencies "relate to" ERISA plans and are therefore preempted. *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312 (2016).

**ANSWER: Defendants admit that *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312 (2016) held that a Vermont law, Vt. Stat. Ann., Tit. 18 § 9410(a)(a) was preempted by ERISA; Defendants deny all remaining allegations of this paragraph.**

4. The PDAA violates ERISA's express preemption provision by requiring parties providing pharmacy benefit management services to health benefit plans to disclose "information relating to health care costs, prices, quality, utilization . . . including data relating to health insurance claims and enrollment"—including in relation to self-insured ERISA plans—***precisely like*** the Vermont statute invalidated by the Supreme Court's decision in *Gobeille*. 577 U.S. at 315-16.

**ANSWER: Defendants deny the allegations of this paragraph.**

5. The Supreme Court has also made clear that state laws that "require providers to structure benefit plans in particular ways" are preempted. *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86-87 (2020). State laws that dictate the design of health benefit plan provider networks (including pharmacy networks) are therefore preempted and may not be applied to ERISA plans. *See McKee Foods Corp. v. BFP Inc.,* 173 F.4th 242 (6th Cir. 2026); *Pharm. Care Mgmt. Ass'n v. Mulready*, 78 F.4th 1183 (10th Cir. 2023).

**ANSWER: Defendants admit that the first sentence of this paragraph contains a quotation from *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86-87 and deny all remaining allegations of this paragraph.**

6. The PDAA includes network design restrictions that prohibit financial incentives for health benefit plan beneficiaries to use certain preferred pharmacies. These restrictions impair the ability of pharmacy benefit managers ("PBMs") and plans to utilize preferred pharmacy networks to ensure cost-efficient, high-quality pharmaceutical care. These provisions are preempted by ERISA because they dictate the design and structure of employee benefit plans in violation of ERISA's express preemption clause.

**ANSWER: Defendants admit that 215 ILCS 5/513b1(f-10) does not permit PBMs to "steer" a covered individual, as "steer" is defined in 215 ILCS 5/513b1(a). Defendants deny the remaining allegations of this paragraph.**

7. The PDAA purports to apply to "pharmacy benefit managers," but its impact will be felt much more broadly. First, the law's broad definition of "pharmacy benefit manager" captures *any* party performing claims processing or other services, which includes any third-party administrator and could even capture health benefit plans themselves. Second, health

benefit plan sponsors (Illinois employers and unions) and plan beneficiaries (Illinois workers) will ultimately pay the price of compliance.

**<u>ANSWER</u>: Defendants admit that the PDAA by its terms applies to "pharmacy benefit managers" as defined within the PDAA and deny all remaining allegations of this paragraph.**

8. This lawsuit seeks a declaration that the PDAA's reporting requirements (215 ILCS § 5/513b1.1) and its network design restrictions (215 ILCS § 5/513b1) are expressly preempted by ERISA as applied to ERISA-covered plans sponsored by employers and unions, and requests that the Court enjoin Defendants from enforcing these provisions against PBMs serving those plans.

**<u>ANSWER</u>: Defendants admit that Plaintiff seeks declaratory and injunctive relief but deny that Plaintiff is entitled to any relief.**

## <u>JURISDICTION AND VENUE</u>

9. PCMA's cause of action arises under 42 U.S.C. § 1983, the Declaratory Judgment Act (28 U.S.C. §§ 2201-2202), the Supremacy Clause of the U.S. Constitution, and the Court's inherent equitable powers.

**<u>ANSWER</u>: Defendants admit that Plaintiff invokes 42 U.S.C. § 1983, the Declaratory Judgment Act (28 U.S.C. §§ 2201-2202), the Supremacy Clause of the U.S. Constitution, and the Court's equitable powers. Defendants deny that the Court has jurisdiction over Defendant IDOI, that IDOI is a "person" within the meaning of § 1983, and deny that declaratory or other relief may be entered against IDOI.**

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to these claims occurred and will occur in this district and because Defendants reside in this district.

**<u>ANSWER</u>: Defendants admit that venue is proper but deny all remaining allegations of this paragraph.**

## <u>THE PARTIES</u>

11. PCMA is the national trade association representing PBMs. PCMA's PBM member companies administer prescription drug benefits for more than 289 million Americans covered by ERISA and non-ERISA health plans.

**ANSWER: Defendants admit PCMA is a national trade association representing PBM members. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.**

12. PCMA is a non-profit 501(c)(6) corporation duly organized under the laws of the State of Delaware with a principal place of business in Washington, D.C. PCMA's institutional mission is to advance the common interests of PBMs; to help PBMs improve the safety and affordability of prescription drug services; and to educate and advocate on behalf of PBMs before state and federal legislators and regulators and in court.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

13. PCMA's members include Abarca Health, CarelonRx, CerpassRx, Express Scripts, Inc., Humana Pharmacy Solutions, LucyRx, MedImpact Healthcare Systems Inc., Navitus, Optum Rx, PerformRx, Prime Therapeutics, ProAct, Rx Benefits, RxPact, RxSense, Script Care Ltd., Serve You Rx, TrueRx, VytlOne, Waltz Health, and WellDyne.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

14. Defendant Ann Gillespie is the Director of the Illinois DOI and is being sued solely in her official capacity. The DOI Director has "the rights, powers, and duties appertaining to the enforcement and execution of all the insurance laws of this State," 215 ILCS § 5/401, including the PDAA. The DOI is headquartered at 320 W. Washington Street, Springfield, Illinois 62767.

**ANSWER: Defendants deny that the DOI is headquartered at 320 W. Washington Street, Springfield, Illinois; Defendants admit the remaining allegations of this paragraph.**

## STANDING

15. PCMA brings this lawsuit on behalf of its members. PCMA's members administer prescription drug benefits on behalf of their health plan customers, which include health plans and beneficiaries who reside in or purchase pharmaceuticals in Illinois.

**ANSWER: Defendants admit that PCMA purports to bring this lawsuit on behalf of its members and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

16. PCMA's members will be injured if they are required to comply with the PDAA's extensive reporting requirements, with the first annual report due September 1, 2026. To comply

with the reporting requirements, PCMA's members and their customer health plan sponsors (employers and unions) must incur significant administrative costs to prepare the requested annual report. The report will by necessity include sensitive and confidential information belonging to the PBMs, health benefit plans, and their members. If they do not comply, PBMs face fines of up to $10,000 per day.

**<u>ANSWER</u>: Defendants admit that the PDAA provides that PBMs' first annual report was due on September 1, 2026 (*but see* Dkt. 34, preliminarily enjoining that provision in part) , is required to include the information specified in 215 ILCS 5/513b1.1(a), and provides in part that "[f]ailure by a [PBM] to submit all required elements in an annual report to the Department may result in a fine levied by the Director not to exceed $10,000 per day, per offense." Defendants deny all remaining allegations of this paragraph.**

17. PCMA's members are also injured by the PDAA's network design provisions because those provisions restrict their ability to design and administer pharmacy networks at the direction of their ERISA plan customers, including their ability to offer beneficiaries incentives to use pharmacies that provide cost savings or quality advantages. PCMA's members rely on beneficiary incentives to operate preferred pharmacy networks, which would be proscribed by the PDAA's operation. As a result, health benefit plans serviced by PCMA's members will no longer be able to ensure high-quality, cost-efficient care at select pharmacies, and their beneficiaries will suffer.

**<u>ANSWER</u>: Defendants deny the allegations of this paragraph.**

18. The interests PCMA seeks to protect through this Complaint are germane to its institutional mission, as the challenged provisions of the PDAA reduce the value proposition of PBM services and subject PCMA's members and the customer health plans they serve to unnecessary and unconstitutional costs.

**<u>ANSWER</u>: Defendants deny that the PDAA subjects PCMA members and their customer health plans to unnecessary and unconstitutional costs and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.**

19. The claims in this Complaint serve PCMA's members' common interests. PCMA accordingly has Article III standing to sue on behalf of the members under the doctrine of associational standing. Neither the claims asserted, nor the relief requested, require the participation of individual members in this lawsuit.

**<u>ANSWER</u>: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

## ERISA PREEMPTION

20. ERISA is a comprehensive federal statute that regulates employee benefit plans, including prescription drug benefit plans. 29 U.S.C. § 1001 *et seq.* ERISA was passed in 1974, and includes a broad preemption provision, providing that ERISA and its implementing regulations "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a).

**ANSWER: Defendants admit the allegations of this paragraph.**

21. With this express preemption language, Congress "intended to preempt the field for Federal regulations, thus eliminating the threat of conflicting or inconsistent State and local regulation of employee benefit plans." *Shaw v. Delta Air Lines*, 463 U.S. 85, 99 (1983).

**ANSWER: Defendants admit that this paragraph contains a quotation from *Shaw v. Delta Air Lines*, 463 U.S. 85, 99 (1983). Defendants deny all remaining allegations of this paragraph.**

22. ERISA's preemption clause is rooted in Congress's acknowledgment that "[a] patchwork scheme of regulation would introduce considerable inefficiencies in benefit program operation," leading to "reduce[d] benefits" for American workers. *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11 (1987). Therefore, Congress sought to avoid "[r]equiring ERISA administrators to master the relevant laws of 50 States," which "would undermine the congressional goal of minimiz[ing] the administrative and financial burden[s] on plan administrators – burdens ultimately borne by the beneficiaries." *Gobeille*, 577 U.S. at 321 (internal quotation marks and citations omitted).

**ANSWER: Defendants admit that this paragraph contains quotations from *Fort Halifax Packin Co. v. Coyne*, 482 U.S. 1, 11 (1987) and *Gobeille*, 577 U.S. at 321, altered as specified, and deny all remaining allegations of this paragraph.**

23. In the more than fifty years since ERISA's passage, Congress has continued to exercise its prerogative to occupy the field of employee benefits by amending ERISA numerous times, including most recently this year in the Consolidated Appropriations Act of 2026.

**ANSWER: Defendants admit that Congress has amended ERISA in the more than fifty years since its passage, including with the Consolidated Appropriations Act of 2026, and deny all remaining allegations of this paragraph.**

24. The Supreme Court has addressed ERISA's "comprehensive" preemption provision many times over the past five decades. In determining whether a state law "relate[s] to" employee benefit plans under that provision, the Court looks to whether the law has a

"reference to" or "connection with" employee benefit plans covered by ERISA. *Gobeille*, 577 U.S. at 319-20.

**ANSWER: Defendants admit that, in *Gobeille*, 577 U.S. at 319-20, the Supreme Court provided a standard for ERISA preemption and that the Supreme Court has addressed ERISA's preemption provision in other cases in the last fifty years. Defendants deny all remaining allegations of this paragraph.**

25. Relevant here is the "connection with" test. State laws have an impermissible "connection with" ERISA plans if they "govern . . . a central matter of plan administration" or "interfere[] with nationally uniform plan administration." *Id.* at 323. Preempted state laws include those that prohibit employers from structuring their employee benefit plans in a particular way, *Shaw*, 463 U.S. at 97, and those that "bind[] ERISA plan administrators to a particular choice." *Egelhoff v. Egelhoff*, 532 U.S. 141, 147 (2001).

**ANSWER: Defendants admit that this paragraph contains quotations from *Gobeille*, 577 U.S. at 323, and *Egelhoff v. Egelhoff*, 532 U.S. 141, 147 (2001), and deny all remaining allegations of this paragraph.**

26. In 2016, the Supreme Court considered a challenge brought by Liberty Mutual Insurance Company to invalidate a Vermont law that required various entities, including ERISA health plans and their administrators, to disclose "payments relating to health care claims and other information relating to health care services." *Gobeille*, 577 U.S. at 315.

**ANSWER: Defendants admit the allegations of this paragraph.**

27. The Vermont law at issue in *Gobeille* required public and private payors to provide information to be "compiled into a database reflecting 'all health care utilization, costs, and resources in [Vermont], and health care utilization and costs for services provided to Vermont residents in another state.'" *Id.*, citing 18 V. S. A. § 9410(b).

**ANSWER: Defendants admit that this paragraph contains an accurate quotation from *Gobeille*, 577 U.S. at 315, and deny all remaining allegations of this paragraph.**

28. Liberty Mutual, a self-funded ERISA plan sponsor, challenged the law's requirement that its third-party administrator, Blue Cross Blue Shield of Massachusetts, report the information it possessed about plan members (Liberty Mutual's employees and former employees and their families).

**ANSWER: Defendants admit the allegations of this paragraph.**

29. The Supreme Court confirmed that "Vermont's reporting regime . . . both intrudes upon 'a central matter of plan administration' and 'interferes with nationally uniform plan administration.'" *Id.* at 323.

**ANSWER: Defendants admit that this paragraph contains a quotation from the Supreme Court's opinion in *Gobeille*, 577 U.S. at 323, and deny the remaining allegations in this paragraph.**

30. Because Vermont's law governed "fundamental components of ERISA's regulation of plan administration," opening plans up to "wasteful administrative costs" and "wide-ranging liability," the Court held that "[p]re-emption is necessary." *Id.*

**ANSWER: Defendants admit that paragraph 29 contains a quotation from the Supreme Court's opinion in *Gobeille*, 577 U.S. at 323. Defendants deny all remaining allegations of this paragraph.**

31. *Gobeille* remains good law today.

**ANSWER: Defendants admit that *Gobeille* has not been overruled and deny all remaining allegations of this paragraph.**

32. In the ten years since *Gobeille*, the Supreme Court has reaffirmed the "connection with" test for ERISA preemption. In 2020, it reinforced that this test captures not only reporting requirements like those at issue in *Gobeille*, but also "laws that require providers to structure benefit plans in particular ways." *Rutledge*, 592 U.S. at 86-87.

**ANSWER: Defendants deny the allegations of this paragraph.**

33. Laws that restrict how ERISA plans choose to design their provider networks fall squarely within ERISA's preemptive scope. For this reason, every federal court of appeals that has considered a challenge to a law that dictates the structure of provider networks has found that those laws bear an impermissible connection with ERISA and are therefore preempted. *See, e.g.*, *Ky. Ass'n of Health Plans v. Nichols*, 227 F.3d 352, 362 (6th Cir. 2000); *CIGNA Healthplan v. Louisiana ex rel. Ieyoub*, 82 F.3d 642, 649 (5th Cir. 1996); *see also Ky. Ass'n of Health Plans v. Miller*, 538 U.S. 329 (2003).

**ANSWER: Defendants deny the allegations of this paragraph.**

34. After *Rutledge* reiterated that ERISA preempts laws that dictate benefit design, multiple courts have invalidated state laws that dictate the structure of benefit plans by imposing restrictions or mandates on the structure of a pharmacy network, including laws targeting PBMs. *See McKee Foods Corp.*, 173 F.4th 242; *Mulready*, 78 F.4th 1183; *see also Iowa Ass'n of Bus. & Indus. v. Ommen*, 799 F. Supp. 3d 795 (S.D. Iowa 2025) (preliminarily enjoining law because Plaintiff likely to succeed on merits of ERISA preemption challenge).

**ANSWER: Defendants deny the allegations of this paragraph.**

## FACTS

A. The Prescription Drug Market and PBMs' Administrative Role

35. Most Americans who obtain prescription drugs through employer-sponsored or union-sponsored medical plans are covered by plans subject to ERISA. Approximately two-thirds of those employer-sponsored plans and multiemployer plans are "self-funded" ERISA plans, meaning that they reimburse covered products and services with their own funds and employee premium contributions, rather than purchasing third-party health insurance for their members.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

36. When a consumer fills a prescription at the pharmacy counter, the resulting transaction is the product of several pre-existing contractual relationships involving several different entities across the supply chain. Manufacturers make and bring drugs to market. Wholesalers purchase drugs in bulk from the manufacturers and distribute them to pharmacies, doctors, and hospitals. PBMs negotiate drug reimbursement prices with pharmacies. Prescription drug benefit plans set cost-sharing allocation for their beneficiaries, which determines what percentage of prescription prices is paid by the beneficiary, and what percentage is paid by the plan. In this way, consumers can take advantage of prices negotiated between PBMs (on behalf of health benefit plans) and pharmacies.

**ANSWER: Defendants admit the allegations of the first three sentences of this paragraph. Defendants deny all remaining allegations of this paragraph.**

37. Designing and administering prescription-drug benefit plans is a complex and time-consuming undertaking that employers and unions ordinarily do not handle on their own. Most employer and union sponsors of self-funded plans therefore retain PBMs to provide recommendations on the design of, and to help administer, their prescription-drug benefit plans.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

38. The sponsor of a prescription-drug benefit plan (typically, an employer or union) determines the plan's benefit design, which includes "what drugs the plan covers (the formulary), how much the plan will pay for those drugs (the cost-sharing terms), and at which pharmacies beneficiaries can have prescriptions filled (the pharmacy network)." *Mulready*, 78 F.4th at 1188.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

39. PBMs perform numerous tasks to help the health benefit plan achieve its benefit design goals. These tasks include helping plan sponsors construct pharmacy networks (retail, mail-order, and specialty pharmacy networks), including helping them decide how broad or narrow a network to adopt and whether to use a preferred network.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

40. Preferred pharmacy networks are limited networks of pharmacies where plans and beneficiaries pay a lower amount for the drug than at a pharmacy in the standard network.

**ANSWER: Defendants deny the allegations of this paragraph.**

41. A preferred pharmacy network provides benefits to pharmacies, plan sponsors, and beneficiaries. Beneficiaries benefit because plan sponsors offer reduced copayments and coinsurance for drugs obtained at a pharmacy in the preferred pharmacy network. Pharmacies in the preferred network benefit because they obtain a higher volume of beneficiaries from being in a limited network of pharmacies where beneficiaries can obtain drugs at lower cost-sharing amounts. Plan sponsors benefit because pharmacies in a preferred network agree to lower reimbursement rates.

**ANSWER: Defendants deny the allegations of this paragraph.**

42. In addition to benefit design tasks, PBMs assist with myriad administrative tasks, including processing claims and appeals and monitoring pharmacy compliance. Importantly, PBMs assist plans in fulfilling their government and beneficiary reporting obligations. "ERISA's reporting, disclosure, and recordkeeping requirements for welfare benefit plans are extensive." *Gobeille*, 577 U.S. at 321 (citing 29 U.S.C. §§ 1021-1024, 1131). The requirements include disclosures to plan participants concerning plan coverage and the plan financials, and an annual report to the Secretary of Labor. PBMs managing pharmacy benefits and other third-party administrators serving ERISA plans assist those plans in meeting those requirements.

**ANSWER: Defendants admit that this paragraph contains a quotation from *Gobeille*, 577 U.S. at 321. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.**

43. In almost every case, plans direct the work that PBMs perform. PBMs use their expertise to make recommendations on plan design. For plan administration, PBMs follow the direction of plan fiduciaries.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

B. The Illinois Prescription Drug Affordability Act

44. The PDAA, proposed as HB1697, was signed into law on July 1, 2025. It includes sweeping restrictions on and mandates for pharmacy benefit managers, defined as "a person, business, or entity, including a wholly or partially owned or controlled subsidiary of a pharmacy benefit manager, that provides claims processing services or other drug or device services, for health benefit plans."

**ANSWER: Defendants admit the allegations of the first sentence of this paragraph and further admit that this paragraph quotes the definition of pharmacy benefit managers from 215 ILCS 5/513b1(a). Defendants deny all remaining allegations of this paragraph.**

45. The statute provides that "Notwithstanding [specific exemptions for self-funded employee benefit plans] of the Insurance Code," "health benefit plan" includes self-funded employee welfare benefit plans except for self-funded multiemployer plans that are not nonfederal government plans.

**ANSWER: Defendants admit that the PDAA states, in part, within 215 ILCS 5/513b1(a) that "[n]otwithstanding Sections 122-1 through 122-4 of this Code, 'health benefit plan' includes self-funded employee welfare benefit plans except for self-funded multiemployer plans that are not nonfederal government plans." Defendants deny all remaining allegations of this paragraph.**

46. Although certain provisions of the PDAA that impose requirements on an "insurer" or "health insurer" do not apply to self-funded ERISA plans, the provisions of the PDAA applicable to "pharmacy benefit managers" include PBMs serving employer or union sponsored self-funded ERISA plans (except self-funded multiemployer plans) by virtue of the definition's reference to "health benefit plans."

**ANSWER: Defendants deny the allegations of this paragraph.**

C. The PDAA's Reporting Requirements

47. Section 513b1.1 of the PDAA requires PBMs to submit an annual report to the Department of Insurance and plan sponsors and insurers by September 1, with the first annual report due September 1, 2026.

**ANSWER: Defendants admit the allegations of this paragraph.**

48. The annual report requires extensive data reporting. It requires "data on the health benefit plan" including for each plan "a list of drugs including corresponding information on therapeutic class, brand name, generic name, or specialty drug name," "number of covered individuals," "number of drug-related claims," "dosage units," "dispensing channel used," and "average wholesale acquisition cost per drug." The PBM is also required to disclose total gross spending on drugs by each plan and total net spending on drugs by each plan customer.

**ANSWER: Defendants admit that the paragraph contains partial quotations from 215 ILCS 5/513b1.1 and that 215 ILCS 5/513b1.1(a)(3)-(4) requires reporting "total gross spending on drugs by the health benefit plan" and "total net spending, gross spending less administrative portion of the medical loss ratio, on drugs by the health benefit plan." Defendants deny all remaining allegations of this paragraph.**

49. The annual report includes numerous metrics that must be disclosed on a claim-by-claim basis, including: "total out-of-pocket spending" by individual per drug, per transaction; the amount paid by the plan to the PBM for reimbursement per transaction; the amount paid by PBM to pharmacies per transaction; the specific rebate amount received by the PBM per transaction; the amount passed through to the plan per transaction; and the amount passed through to the covered individual at the point of sale per transaction.

**ANSWER: Defendants admit that 215 ILCS 5/513b1.1 in part requires PBMs' annual reports to include "total out-of-pocket spending by deidentified covered individual per drug, per transaction"; "the amount paid by the health benefit plan to the [PBM] for reimbursement cost of a drug and service per transaction"; "the amount a [PBM] paid for pharmacists' services and drugs rendered related to the health benefit plan per transaction, including but not limited to, any dispensing fee"; and "the specific rebate amount received by the [PBM] per transaction, the amount of the rebates passed through to the health benefit plan per transaction, and the amount of the rebates passed on to the covered individuals at the point of sale that reduced the covered individuals' applicable deductible, copayment, coinsurance, or other cost-sharing amount per transaction." Defendants deny all remaining allegations of this paragraph.**

50. Finally, the annual report requires disclosure of any information collected from manufacturers pertaining to copayments; any compensation paid to brokers, consultants, or advisors for "referrals, consideration, or retention by the health benefit plan"; explanation of benefit design parameters that steer covered individuals toward affiliated pharmacies, the percentage of drugs charged by affiliated pharmacies, and a list of drugs dispensed by affiliated pharmacies with their costs; and copies of each contract the PBM has with the plan sponsor or insurer.

**<u>ANSWER</u>: Defendants admit that 215 ILCS 5/513b1.1 in part requires PBMs to report "any information collected from drug manufacturers pertaining to copayment assistance to the extent such information is collected"; "any compensation paid to brokers, consultants, advisors, or any other individual or firm for referrals, consideration, or retention by the health benefit plan"; "explanation of benefit design parameters encouraging or requiring covered individuals to use affiliated pharmacies, percentage of drugs charged by these pharmacies, and a list of drugs dispensed by affiliated pharmacies with their associated costs"; and "a complete copy of each unredacted contract the [PBM] has with the health benefit plan sponsor or insurer." Defendants deny all remaining allegations of this paragraph.**

51. The PBM is also required to prepare a "summary format" of the report with "aggregated information to help covered individuals understand their health benefit plan's drug coverage." This summary version of the report shall be marked for public access.

**<u>ANSWER</u>: Defendants admit the allegations of this paragraph.**

52. Failure to submit the report could result in a fine of up to $10,000 per day. 215 ILCS § 5/513b1.1(d).

**<u>ANSWER</u>: Defendants admit that 215 ILCS 5/513b1.1(d) provides in part that "[f]ailure by a [PBM] to submit all required elements in an annual report to the Department may result in a fine levied by the Director not to exceed $10,000 per day, per offense." Defendants deny all remaining allegations of this paragraph.**

53. The law states that the annual reports will be used "for the creation of a pharmacist dispensing cost report." 215 ILCS § 5/513b1.1(b). The collection of data for the purpose of generating a state report renders the PDAA directly analogous to the state all-payer claims database governed by the Vermont law at issue in *Gobeille*.

**<u>ANSWER</u>: Defendants admit that 215 ILCS 5/513b1.1(b), in part, provides that "[t]he Department may share all reports with an established institution of higher education in this**

**State for the creation of a pharmacist dispensing cost report to be produced annually." Defendants deny all remaining allegations of this paragraph.**

54. Many of the PDAA's disclosure requirements seek information on matters pertaining to highly confidential plan and sponsor decisions, such as manufacturer rebates, and highly confidential personal health information relating to plan participants.

**ANSWER: Defendants deny the allegations of this paragraph.**

55. ERISA requires government reporting for some of the information demanded by the PDAA. For example, most self-funded ERISA plans must file Form 5500 with the Secretary of Labor, which reports assets and liabilities and receipts and disbursements of funds, including paid claims. *See Gobeille*, 577 U.S. at 321; *see also* Dept. of Labor, Reporting and Disclosure Guide for Employee Benefit Plans, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resourcecenter/ publications/reporting-annual-disclosure.pdf; Schedule H (Form 5500). ERISA also requires plans to make significant disclosures to beneficiaries. 29 U.S.C. §§ 1021-1024; 29 U.S.C. § 1133.

**ANSWER: Defendants admit that self-funded ERISA plans must file with the Secretary of Labor Form 5500, which reports assets and liabilities and receipts and disbursements of funds, including paid claims and that ERISA requires disclosures set forth in 29 U.C.S. §§ 1021-24 & 1133. Defendants deny all remaining allegations of this paragraph.**

56. PBMs assist ERISA plans with their reporting and disclosure obligations.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

57. In coming years, PBMs will also be required to report detailed claims and compensation data to the health plans that they serve pursuant to an amendment to ERISA passed earlier this year. *See* Consolidated Appropriations Act, 2026, 119 P.L. 75; 2026 Enacted H.R. 7148; 119 Enacted H.R. 7148; 140 Stat. 173.

**ANSWER: Defendants admit that Congress recently passed the 2026 Consolidated Appropriations Act, 119 P.L. 75; 2026 Enacted H.R. 7148; 140 Stat. 173, which takes effect in "plan years beginning on or after the date that is 30 months after February 3, 2026. Defendants further admit that this Act, "once in effect," may "change [the] preemption analysis" for some statutory reporting requirements, *see Central States, Se. & Sw. Areas***

***Health & Welfare Fund v. McClain*, --- F.4th ----, No. 25-2727, 2026 U.S. App. LEXIS 26067, at *17 (7th Cir. Aug. 26, 2026). Defendants deny all remaining allegations of this paragraph.**

58. Although there is some overlap in the reporting and disclosure requirements of the PDAA and ERISA, the differences between the two "undermine the congressional goal of minimiz[ing] the administrative and financial burden[s] on plan administrators – burdens ultimately borne by the beneficiaries." *Gobeille*, 577 U.S. at 321 (citations omitted).

**ANSWER: Defendants deny the allegations of this paragraph.**

D. The PDAA's Network Design and Anti-Steering Provisions

59. The PDAA prohibits "steering." 215 ILCS § 5/513b1(f-10). "Steer" is defined to include, but is not limited to: (1) requiring a patient to use an affiliated pharmacy; (2) "offering or implementing" a plan design that "encourages" a covered individual to use an affiliated pharmacy "if the plan design increases costs" for the patient, such as imposing higher co-pays or cost-sharing for use of non-affiliated pharmacies; and (3) reimbursing a pharmacy less than the amount that a PBM would reimburse itself or an affiliate. 215 ILCS § 5/513b1(a).

**ANSWER: Defendants admit that the PDAA, in 215 ILCS 5/513b1(a), states that:**

> **"Steer" includes but is not limited to:**
>
> **(1) requiring a covered individual to only use a pharmacy, including a mail-order or specialty pharmacy, in which the [PBM] or its affiliate, or an insurer or its affiliate, maintains an ownership interest or control;**
>
> **(2) offering or implementing a plan design that encourages a covered individual to only use a pharmacy in which the [PBM] or an affiliate or an insurer or its affiliate, maintains an ownership interest or control, if the plan design increases costs for the covered individual. This includes a plan design that requires a covered individual to pay higher costs or an increased share of costs for a drug or drug-related service if the covered individual uses a pharmacy that is not owned or controlled by the [PBM] or its affiliate or an insurer or its affiliate; and**

**(3) reimbursing a pharmacy or pharmacist for a drug and pharmacist service in an amount less than the amount that the [PBM] or an insurer reimburses itself or an affiliate, including affiliated manufacturers or joint ventures providing the same drug or service.**

**Defendants admit that the PDAA, in 215 ILCS 5/513b1(f-10), states that "[a] pharmacy benefit manager or an affiliate acting on its behalf shall not steer a covered individual." Defendants deny all remaining allegations of this paragraph.**

60. The prohibition on steering directly infringes on plan design. Plans cannot offer a preferred pharmacy network without providing beneficiaries discounts and other forms of incentives to drive their prescriptions to preferred pharmacies.

**ANSWER: Defendants deny the allegations of this paragraph.**

61. The PDAA's network design and anti-steering provisions mirror the provisions struck down in *Mulready*, 78 F.4th at 1191, and *McKee Foods Corp.*, 173 F.4th at 269, and are similar to those preliminarily enjoined by and held likely to be preempted in *Ommen*, 799 F. Supp. 3d at 824-29.

**ANSWER: Defendants deny the allegations of this paragraph.**

E. The PDAA's Provisions Inflict Immediate and Concrete Harms

62. Absent declaratory and injunctive relief, the PDAA's reporting requirements and network design restrictions will cause imminent harm to PCMA's members. PCMA's members will be required to compile and submit extensive, claim-level data to Illinois state authorities by September 1, 2026, or face fines of up to $10,000 per day.

**ANSWER: Defendants deny the allegations of this paragraph.**

63. The PDAA's network design and anti-steering restrictions require PCMA's members to restructure pharmacy benefit designs for ERISA plans operating in Illinois, eliminating cost-saving features and network differentiation that plan participants and sponsors would otherwise enjoy.

**ANSWER: Defendants deny the allegations of this paragraph.**

64. Going forward, PBMs will have to develop burdensome administrative processes and state-specific plan designs applicable to ERISA plans in Illinois but not to ERISA plans in other states. The inefficiencies inherent in these kinds of state-by-state compliance efforts are precisely those that ERISA's express preemption clause was designed to prevent. *See* 29 U.S.C. § 1144(a); *see also Gobeille*, 577 U.S. at 323 ("Pre-emption is necessary" where state law exposes plans to "wasteful administrative costs" and "wide-ranging liability").

**<u>ANSWER</u>: Defendants deny the allegations of this paragraph.**

65. The public interest and balance of equities favor a declaration and permanent injunctive relief in favor of PCMA. Although the initial burden of complying with the PDAA falls on PBMs, some costs of compliance will inevitably be passed on to employer and union plan sponsors, and the workers and their families who are enrolled in health benefit plans. Plans will also have to change the structure of their pharmacy network to satisfy the PDAA, thereby directly affecting beneficiaries. ERISA's preemption clause embodies Congress's judgment that uniform federal standards best serve beneficiaries and plan sponsors by minimizing administrative burden and ensuring consistent rights and obligations.

**<u>ANSWER</u>: Defendants deny the allegations of this paragraph.**

## <u>CLAIMS FOR RELIEF</u>

## <u>COUNT 1</u>

## (ERISA PREEMPTION OF REPORTING PROVISION)

66. PCMA realleges paragraphs 1–65 as if fully set forth herein.

**<u>ANSWER</u>: Defendants incorporate their answers to the foregoing paragraphs as if fully restated herein.**

67. "ERISA's reporting, disclosure, and recordkeeping requirements for welfare benefit plans are extensive." *Gobeille,* 577 U.S. at 321. A state law that compels the disclosure of detailed information by third-party administrators to state authorities is preempted because it intrudes upon a central matter of plan administration. *Id.* at 323.

**<u>ANSWER</u>: Defendants admit that this paragraph contains a quotation from *Gobeille*, 577 U.S. at 321, and deny all remaining allegations of this paragraph.**

68. The PDAA's reporting requirements under 215 ILCS § 5/513b1.1 compel PBMs acting as third-party administrators of ERISA plans to disclose detailed, claim-level plan information to Illinois state authorities. The reporting requirements closely mirror the data required under the Vermont law held preempted in *Gobeille*.

**<u>ANSWER</u>: Defendants deny the allegations of this paragraph.**

69. The stated purpose of the PDAA's data collection is "for the creation of a pharmacist dispensing cost report," meaning that the purpose of the data collection is not merely "incidental" to the enforcement of other laws. *See Gobeille*, 577 U.S. at 325-26. This data collection purpose is directly analogous to the state all-payer claims database governed by the Vermont law at issue in *Gobeille*, which was purportedly designed for the purpose of collecting information on health care utilization, pricing, and quality.

**<u>ANSWER</u>: Defendants deny the allegations of this paragraph.**

70. The PDAA's reporting requirements have an impermissible "connection with" ERISA plans because they deal with the subject matters covered by ERISA—namely, reporting, Disclosure, and recordkeeping—which are central to, and an essential part of, the uniform system of plan administration contemplated by ERISA. *Gobeille*, 577 U.S. at 323; 29 U.S.C. § 1021.

**ANSWER: Defendants deny the allegations of this paragraph.**

71. The PDAA's reporting requirements impose novel, inconsistent, and burdensome requirements that interfere with nationally uniform plan administration, in violation of ERISA's express preemption clause. 29 U.S.C. § 1144(a).

**ANSWER: Defendants deny the allegations of this paragraph.**

## COUNT 2

### (ERISA PREEMPTION OF PDAA NETWORKING DESIGN PROVISION)

72. PCMA realleges paragraphs 1–71 as if fully set forth herein.

**ANSWER: Defendants incorporate their answers to the foregoing paragraphs as if fully restated herein.**

73. The Supreme Court has long held that ERISA preempts state laws that interfere with employee benefit plan design. *See Shaw*, 463 U.S. at 97 (regulations that "prohibit[] employers from structuring their employee benefit plans in a [particular] manner" are preempted). State law provisions concerning pharmacy network design, including those provisions that prohibit or restrict steering or preferred networks, are preempted because they dictate plan benefits by dictating the scope and nature of the pharmacy network. *See, e.g.*, *McKee Foods Corp.*, 173 F.4th at 269 ("[T]he incentive provisions bar ERISA plans operating in Tennessee from steering plan participants toward or away from certain pharmacies with higher or lower cost-sharing arrangements. This restriction operates to require an ERISA plan to 'structure [its] benefit plans in [a] particular way[].'") (citing *Rutledge*, 592 U.S. at 86-87); *Mulready*, 78 F.4th at 1198 ("ERISA preempts these provisions because a pharmacy network's scope (which pharmacies are included) and differentiation (under what cost-sharing arrangements those pharmacies participate in the network), are key benefit designs for an ERISA plan.").

**ANSWER: Defendants admit that this paragraph contains quotations from the cited cases. Defendants deny all remaining allegations of this paragraph.**

74. The PDAA's anti-steering provision in 215 ILCS § 5/513b1 mirrors the provisions struck down in *Mulready* and *McKee Foods*. It directly infringes on plan design as it would prohibit plans from offering beneficiaries discounts and other forms of incentives that encourage selection of pharmacies that offer significant cost savings or quality advantages. *See Mulready*, 78 F.4th at 1191; *McKee Foods Corp.*, 173 F.4th at 269.

**ANSWER: Defendants deny the allegations of this paragraph.**

75. The PDAA's network design and anti-steering provision has an impermissible "connection with" ERISA plans because it binds ERISA plan administrators to a particular choice concerning benefit plan design—namely, it prohibits plan sponsors from structuring pharmacy networks with preferred network features and cost-sharing differentiation.

**ANSWER: Defendants deny the allegations of this paragraph.**

76. The PDAA's network design and anti-steering provision is preempted by ERISA's express preemption clause. 29 U.S.C. § 1144(a).

**ANSWER: Defendants deny the allegations of this paragraph.**

**REQUEST FOR RELIEF**

WHEREFORE, PCMA respectfully prays that this Court enter judgment in its favor and:

a) Declare that 215 ILCS § 5/513b1.1 (the PDAA's reporting requirement) is preempted by ERISA, 29 U.S.C. § 1144(a), and therefore is invalid and unenforceable as applied to ERISA-covered benefit plans;

b) Declare that 215 ILCS § 5/513b1 (the PDAA's anti-steering and network design provision) is preempted by ERISA, 29 U.S.C. § 1144(a), and therefore is invalid and unenforceable as applied to ERISA-covered benefit plans;

c) Permanently enjoin Defendants and their agents from implementing or enforcing 215 ILCS § 5/513b1.1 and 215 ILCS § 5/513b1 in any manner as applied to ERISA-covered benefit plans;

d) Award PCMA its reasonable attorneys' fees and costs; and

e) Grant such other and further relief as the Court deems just and proper.

**ANSWER: Defendants deny that Plaintiff is entitled to the requested, or any, relief.**

**ANSWERING FURTHER: Defendants deny each and every allegation not heretofore answered.**

**JURY DEMAND**

**Defendants demand a jury trial on all claims herein so triable.**

**<u>AFFIRMATIVE DEFENSES</u>**

**<u>First Affirmative Defense</u>: All claims against the Department of Insurance are barred by the Eleventh Amendment, regardless of the relief sought. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 119-20 (1984).**

**<u>Second Affirmative Defense</u>: Any official-capacity claims for damages against Director Gillespie are also barred by the Eleventh Amendment, as are any claims for relief that is not prospective in nature or relief that does not redress an ongoing violation of federal law.**

**WHEREFORE, Defendants deny that Plaintiff is entitled to any relief, and request that this Court dismiss Plaintiff's complaint and grant any other relief that this Court deems just.**

Respectfully submitted,

KWAME RAOUL
Attorney General of Illinois

By: <u>s/Deborah Beltran</u>
DEBORAH BELTRAN
Assistant Attorney General
General Law Bureau
115 S. LaSalle St.
Chicago, Illinois 60603
deborah.beltran@ilag.gov

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that she caused a true and correct copy of Defendants' Answer and Affirmative Defenses to Plaintiff's Complaint to be filed using the CM/ECF filing system, for electronic service upon the parties of record on this 30th day of September, 2026.

Respectfully submitted,

KWAME RAOUL
Attorney General of Illinois

/s/ Deborah M. Beltran
Deborah Morgan Beltran
Assistant Attorney General
Office of the Illinois Attorney General
Government Representation Division
115 South LaSalle Street
Chicago, Illinois 60603
773-519-1757
deborah.beltran@ilag.gov